J-S18016-17

2017 PA Super 200

| IN THE INTEREST OF: J.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: JA.M., MOTHER | No. 2515 EDA 2016 |

Appeal from the Order Entered July 25, 2016
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s): CP-51-DP-0000557-2016
FID: 51-FN-000503-2016

BEFORE: PANELLA, J., SOLANO, J., and FITZGERALD, J.[*]

OPINION BY SOLANO, J.:                                    **FILED JUNE 27, 2017**

Ja.M. ("Mother") appeals from an order entered by the Family Court of Philadelphia County on July 25, 2016, holding that her child, J.M. ("the Child"), born in 2015, was the victim of physical abuse perpetrated by Mother and that Mother's conduct constituted "aggravated circumstances" under the Juvenile Act[1] and "child abuse" under the Child Protective Services Law.[2] The family court also held that, as the Child's father, A.S. ("Father"), was available to assume custody, the Child is not "dependent" under the Juvenile Act. Mother contends that, because the family court held that the Child is not dependent, it was precluded as a matter of law from making a

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 6301-6375.

[2] 23 Pa.C.S. §§ 6301-6386.

finding of "aggravated circumstances."  Mother additionally argues that the family court's finding of "child abuse" is not supported by the record.  We reverse.

Mother and Father are not married and do not live together.  They shared custody of the Child, and the Child was scheduled to be in Father's care every Tuesday and Thursday and every other weekend.

Mother testified that Father had physical custody of the Child from Friday, February 19, 2016, to Sunday, February 21, 2016, and that on February 19, Father and the Child were at the home of father's mother ("Paternal Grandmother").  N.T., 7/25/16, at 14-21; Family Ct. Op., 11/14/16, at 14-15.  According to Mother, she "was texting" Father that day, and Father gave her permission to see the Child briefly.  Mother stated that when she arrived at Paternal Grandmother's house, she had an altercation with Paternal Grandmother and that Paternal Grandmother assaulted her.

On Tuesday, February 23, 2016, Mother and Father were supposed to meet at a police station for a custody exchange.  Mother did not appear for the exchange.  After waiting for forty-five minutes, Father filed a police report.  N.T., 5/19/16, at 13-14, 50-56; Family Ct. Op., 11/14/16, at 6, 8.  Mother also did not arrive with the Child for the next scheduled custody exchange on Thursday, February 25, 2016.

The petitioner in this action, the City of Philadelphia's Department of Human Services ("DHS"), contends that Mother had the Child in her physical

custody "from February 26th through . . . March 1, 2016."  DHS's Brief at 5 (citing N.T., 5/19/16, at 14).  Mother testified that she had the Child for half of the day on February 26, and that her mother ("Maternal Grandmother") had the Child from then until February 29.  N.T., 7/25/16, at 22-26; Family Ct. Op., 11/14/16, at 7, 15.

On February 28, 2016, Maternal Grandmother took the Child to St. Mary Medical Center, where he was diagnosed with a fractured right wrist; there was no clear explanation for the injury.  Statement of Facts (attached to Dependency Pet.), 3/9/16, ¶ c; Family Ct. Op., 11/14/16, at 8.  Mother testified that the injury occurred while he was with her mother,[3] but, as discussed below, she also sought at other times to blame the injury on Paternal Grandmother.  **See** N.T., 5/19/16, at 106 (testimony about what she told doctors).  Mother also testified that she did not know how the injury occurred.  N.T., 7/25/16, at 29.  The Medical Discharge Instructions from St. Mary Medical Center state:  "Your child has a broken bone (fracture) in the forearm (radius or ulna bone).  This is a very common fracture in children."

---

[3] Mother testified:

> Q.:   What happened during your mom's custody with regard to the child?  Did he get injured?
>
> A:    Yes, he did.

When she was asked to explain further, Mother began to relate what she was told by her mother, but opposing counsel objected on hearsay grounds and the court sustained the objection.  N.T., 7/25/16, at 24-25.  No party called Maternal Grandmother as a witness.

Ex. M-1 at 2. The Child's wrist was placed in a splint, and he was discharged. Family Ct. Op., 11/14/16, at 18.

On March 1, 2016, Mother found the Child in distress in his playpen. N.T., 7/25/16, at 35; Ex. DHS-3 at 81-82. She took him to the Emergency Department of the Children's Hospital of Philadelphia ("CHOP") for treatment. N.T., 7/25/16, at 36. According to Mother, she "told them that my mother had my son over the weekend, he came back with a fracture. I don't really know what took place." *Id.* The doctors placed the Child's arm in a cast. *Id.* at 37.

The CHOP doctors sought a consultation by CHOP's Suspected Child Abuse and Neglect team, and the Child was seen by Dr. Stephanie Ann Deutsch of that team. N.T., 5/19/16, at 63. Dr. Deutsch testified that her team is consulted when there is a concern about possible abuse or neglect. *Id.* at 64-65. In this case, the Child "had two fractures in his right forearm, with no explanation as to why — why or how he sustained those injuries. Additionally, mother had expressed several safety concerns to the primary team. . . ." *Id.* at 66. Dr. Deutsch related that Mother had told CHOP of a possible "poisoning episode" by Paternal Grandmother that turned out to be unfounded, and of the physical altercation that Mother had had with Paternal Grandmother and that the Child "may have been injured while under [P]aternal [G]randmother's supervision, following the assault event on the

- 4 -

Friday." *Id.* at 70-71.[4] Her report, which was admitted into evidence as Exhibit DHS-3, *id.* at 115, contained extensive notes relating to Mother's reported concerns about Father and Paternal Grandmother.[5] Dr. Deutsch

_____

[4] Dr. Deutsch recorded the date of the altercation that Mother reported with Paternal Grandmother as February 26, 2016. N.T. 5/19/16, at 92-93, 97, 105-07. At the hearing in this matter, Mother claimed that when she had spoken with a doctor at CHOP on Tuesday, March 1, 2016, she mistakenly told the doctor that Paternal Grandmother's assault had happened on "the prior Friday." N.T., 7/25/16, at 32. Mother continued that she had "meant" Friday, February 19, 2016, even though the immediate "prior Friday" was February 26, 2016. *Id.* Mother testified that she was "confused," "because this is about my son and his safety." *Id.* Dr. Deutsch testified that the date of the altercation was important for determining whether the Child was injured at that time, because the Child's injury had not yet begun to heal when the Child was seen at CHOP and an injury that occurred on February 19, rather than on February 26, should have begun healing by then. N.T. 5/19/16, at 77-81.

[5] In part, the report reads:

> Mother states she has had ongoing concerns for [the Child's] safety while under paternal relatives' care, reporting a prolonged history of domestic violence between herself and [the Child's] father, and several verbal and physical altercations between herself and [the Child's] paternal grandmother. . . . Mother states she is concerned in general for his safety in that home environment. . . . Mother states that [the Child's] paternal grandmother is currently under investigation for [a] safety issue by police for issues of harassment/assault against mother. Mother states she is concerned that paternal grandmother injured [the Child's] arm intentionally on Friday afternoon after the altercation between mother and paternal grandmother . . . . Mother is concerned that paternal grandmother is still able to care for [the Child] . . . .

Ex. DHS-3, at 69-70; *see also id.* at 72 ("There is reported history of prior involvement with law enforcement, including assault charges against father for domestic disputes . . . . There is history of intimate partner violence. There is reported prior involvement of child protective services"), 78
*(Footnote Continued Next Page)*

also testified that, "[Mother] had mentioned to us that [the Child] is ambulatory and had started to walk in January, but that there were no witnessed fall events and that, per [M]aternal [G]randmother's report to her, there had been no falls or no trauma while under [M]aternal [G]randmother's supervision." *Id.* at 75.

Dr. Deutsch provided the following explanation of the Child's injury:

> [A] transverse fracture of the radius and buckle fracture of the ulna [bone in the forearm] is a common accidental injury in a developmentally normal ambulatory child. It's commonly sustained by an axial load, meaning that the load is the same direction as the bone. So the most common mechanism would be a child falling and trying to break the fall by falling on an outstretched arm.

N.T., 5/19/16, at 74. Dr. Deutsch testified that this is "a common accidental injury" and "a plausible explanation" for this fracture type is that "there is a developmentally normal ambulatory child who had a fall on an outstretched arm." *Id.* at 88-89. However, when asked whether "intentional injury [can] be ruled out" as a cause, Dr. Deutsch answered, "No, it cannot." *Id.* at 74-75; *see id.* at 88.

CHOP performed several tests on the Child, including a CAT scan of his brain, a urine toxicology test "to assess for any illicit substances," a cardiology evaluation "to assess for any cardiac arrhythmias," and a skeletal

---

*(Footnote Continued)* ————————

("mother describes a history of significant violence involving herself and [the Child's] father and paternal grandmother").

survey as a screening for other fractures. All of those tests were negative for signs of other health problems. N.T., 5/19/16, at 67, 74.

On March 2, 2016, DHS received a Child Protective Services ("CPS") Report about the Child's fracture. Statement of Facts (attached to Dependency Pet.), 3/9/16, ¶¶ c-e. The next day, DHS Investigative Case Worker Rachel DiStephanis went to CHOP to meet with the family and learned that the Child had arrived with pinpoint pupils and intermittent, altered mental status. However, "toxicity screens were completed and admitted," and "the results of the toxicity screens were normal." Family Ct. Op., 11/14/16, at 4 (citing Statement of Facts (attached to Dependency Pet.), 3/9/16, ¶ e). No reason for the observed symptoms was ever determined. N.T., 7/25/16, at 107.

Ms. DiStephanis interviewed Mother, Father, Maternal Grandmother, and Paternal Grandmother, regarding the cause of the Child's wrist fracture. Family Ct. Op., 11/14/16, at 6. Mother initially "related to [Ms. DiStephanis] that she did not know how the injury occurred." *Id.* (citing N.T., 5/19/16, at 11-12). Mother then claimed that the fracture occurred while the Child was in Paternal Grandmother's care, but Ms. DiStephanis doubted Mother's story:

> Ms. DiStephanis did not find Mother credible during her investigation because evidence such as[ p]olice [r]eports, text messages and emails did not corroborate Mother's version [that the Child was in Paternal Grandmother's care when he was injured]. Mother never provided a consistent story as to the custody arrangement of the Child during the week in question.

> Ms. DiStephanis found Father's version of that week in question to be credible. He provided evidence which corroborated his version. She reviewed text messages and [p]olice [r]eports that Father filed when Mother failed to bring the Child to the drop off for the exchange of custody. Therefore, she determined that the Child was most likely, based on the evidence, in the care of either Mother or Maternal Grandmother when he sustained the injury. Both Mother and Maternal Grandmother were indicated, and the basis of the indication was egregious lack of supervision, resulting in a fracture that was not explained.

*Id.* at 7 (citing N.T., 5/19/16, at 14-18, 48); *see also id.* at 10; N.T., 5/19/16, at 57-58.

On March 4, 2016, DHS filed an application for protective custody pursuant to the Juvenile Act, 42 Pa.C.S. § 6324, and obtained an order for protective custody of the Child.[6] On March 7, 2016, after a hearing, a shelter care order was entered by the family court, and the Child was placed in a foster home.

On March 9, 2016, DHS filed a dependency petition, stating: "Upon information provided by the social worker, this child is dependent and/or abused pursuant to the Juvenile Act (42 Pa.C.S. § 6302 (Dependent Child)(1)) and/or the Child Protective Services Law (23 Pa.C.S. § 6303(b)(1))." Dependency Pet., 3/9/16, at ¶ 6.[7] Mother claims that this

---

[6] Section 6324(1) states: "Prior to entering a protective custody order removing a child from the home of the parent, guardian or custodian, the court must determine that to allow the child to remain in the home is contrary to the welfare of the child."

[7] 23 Pa.C.S. § 6303(b)(1), which was cited in the petition, was deleted in 2014 and replaced by 23 Pa.C.S. § 6303(b.1) (defining "child abuse").

dependency petition "ask[ed] for a finding of aggravated circumstances," Mother's Brief, at 5, but the petition made no specific mention of "aggravated circumstances." Instead, it alleged the existence of abuse or neglect in a "Statement of Facts" attached to the petition and recommended that the Child "be committed to the City of Philadelphia Department of Human Services." Dependency Pet., 3/9/16, at ¶ 8.

On March 16, 2016, DHS transferred the social work for the Child and his family to the Bethanna Community Umbrella Agency ("CUA"), and the Child was assigned a new case worker, Tijuanna Harris. N.T., 7/25/16, at 7.

On May 19, 2016, the family court held "an adjudicatory hearing for [the Child] and a child abuse hearing as to biological mother." N.T., 5/19/16, at 6. Dr. Deutsch testified about the Child's injury, as set forth above. *Id.* at 63-71, 74-86, 92-93, 109-110, 113-114. Ms. DiStephanis testified about her investigation and her conversations with Mother and Father, including Mother's assertion that she did not know how the Child's injury occurred. *Id.* at 11-16. Father testified that the Child was not in his possession at the end of February 2016 and recounted that the Child was not present for a custody exchange on February 23 and 25, 2016. *Id.* at 54-61. When asked if she found "Father to be credible during [her] investigation," Ms. DiSephanis answered affirmatively, stating that she "was able to find evidence that backed up his story." *Id.* at 16-17. Ms. DiStephanis also agreed when asked if "Father's story [was] consistent

throughout [her] investigation." *Id.* At the conclusion of this first hearing, the family court removed the Child from foster care and "reunified [him] with Father forthwith [and] grant[ed] custody to Father." *Id.* at 119.

When the hearing was resumed on July 25, 2016, Ms. Harris, the CUA case worker, testified that she supervised the Child at the Father's home "and he seems very bonded with his Father and with the paternal side of the family." Family Ct. Op., 11/14/16, at 14 (citing N.T., 7/25/16, at 8-9). Ms. Harris continued that "Mother has line of sight supervised visits twice a week at the CUA" and "has been consistent with the visits." *Id.* (citing N.T., 7/25/16, at 9). She suggested, "At this time, the CUA may ask that [Mother] have unsupervised visits." N.T., 7/25/16, at 10. Ms. Harris added that "[a] home evaluation was done as to Mother's residence and it was deemed to be appropriate housing." Family Ct. Op., 11/14/16, at 14 (citing N.T., 7/25/16, at 10). Ms. DiStephanis "testified Mother has completed all her single case plan goals [and] the parenting, the housing and all other testing that was asked." Family Ct. Op., 11/14/16, at 14 (citing N.T., 7/25/16, at 11-12). She said she would rate Mother as "fully compliant" and agreed that Mother's visits were "appropriate." N.T., 7/25/16, at 11, 13.

Later during the July 25, 2016 hearing, Mother testified. She told about the altercation with Paternal Grandmother on February 19, 2016, Family Ct. Op., 11/14/16, at 14-15; N.T., 7/25/16, at 14-20; confirmed that she had the Child in her custody from Monday, February 22, 2016, until

Friday, February 26, 2016, and that Maternal Grandmother had physical custody of him from then until Monday, February 29, 2016, Family Ct. Op., 11/14/16, at 15 (citing N.T., 7/25/16, at 22-24, 26); and explained that "she took the Child to CHOP on Tuesday, March 1, 2016, Family Ct. Op., 11/14/16, at 15 (citing N.T., 7/25/16, at 35-36, 38). Mother testified: "I would never hurt my son." *Id.* at 38.

> At the conclusion of July 25, 2016 hearing, the family court stated:
>
> With respect to the claim of aggravated circumstances, the [family c]ourt finds that the Child was in the custody of [M]other when the [C]hild was injured, and the testimony went back and forth.
>
> Sometimes it was clear; sometimes it was as muddy as the Mississippi can be, and [M]other's testimony is inherently not believable. Mother began her testimony and she was well-rehearsed and she appeared to be reading off of a script.
>
> Her answers were not spontaneous. Her answers were unbelievable, and she tried as best as she could to confuse the issue. The issue was that the [C]hild was injured.
>
> Mother's unbelievable testimony further indicates that she's attempting to conceal what happened to the [C]hild while in her care, and she is responsible for the injuries to the child while in her care.
>
> Therefore, the [family c]ourt grants the petition for aggravated circumstances against Mother.

N.T., 7/25/16, at 44.[8]

---

[8] At that time, the family court also ordered supervised, "line of sight" visitation with the Child by Mother at the Bethanna CUA, hoping that "there will be some remediation of the hostility between [M]other and [F]ather." N.T., 7/25/16, at 47-48, 50; *see also* Family Ct. Op., 11/14/16, at 20.

The family court then entered two written orders, both dated July 25, 2016. In one, the "Order of Adjudication – Child Not Dependent," the family court "ORDERED that the child is found not to be a Dependent Child pursuant to the Pennsylvania Juvenile Act, that the petition for dependency is dismissed[, and that] Legal and Physical Custody is transferred to [Father]." Although the family court did not explain this decision in its order, the parties agree that the court correctly held that the Child was not dependent because a parent — Father — was able to assume custody. **See In re M.L.**, 757 A.2d 849, 851 (Pa. 2000) (stating "a child is not dependent if the child has a parent who is willing and able to provide proper care for the child"). Mother does not challenge this order.[9]

The court called its other order the "Aggravated Circumstances Order," and it is that order that Mother challenges in this appeal. In that order, the family court found "that clear and convincing evidence has been presented to establish that the alleged aggravated circumstances exist as to [Mother]" and that the Child "has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated neglect by the parent; proven as to Mother." The order also contained a paragraph called "Additional Findings" that read, "The Court hereby finds that the above named child is a

_____

[9] Because Mother has not appealed this order, we do not disturb the court's transfer of legal and physical custody to Father. Any change of custody should be made pursuant to appropriate proceedings under the Child Custody Law, 23 Pa. C.S. §§ 5321 *et seq*.

victim of child abuse as defined at 23 Pa.C.S. § 6303, in that Court finds Child Abuse against Mother."

In an opinion dated November 14, 2016, the family court stated that DHS had met its burden by clear and convincing evidence to establish the existence of "child abuse" pursuant to 23 Pa.C.S. § 6303(b.1). Family Ct. Op., 11/14/16, at 16-17. The court did not specifically discuss its finding that the Child was abused, but instead devoted the bulk of its opinion regarding the abuse to why it concluded that Mother was responsible for any abuse that occurred. *See id.* at 17-19. The court relied on *In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015), in which the Supreme Court stated: "While a petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, . . . the identity of the abuser need only be established through *prima facie* evidence in certain situations." The court found that the credible testimony led to the conclusion that the Child was not injured while in the custody of Father or Paternal Grandmother, and that Mother therefore should be held responsible. Family Ct. Op., 11/14/16, at 17-19.

The family court also asserted that it "properly found [that DHS] met its burden by clear and convincing evidence [to prove] the existence of aggravated circumstances as to Mother pursuant to [42] Pa.C.S.A. §6341(c.1)." Family Ct. Op., 11/14/16, at 19 (capitalization omitted). The court again focused on who was responsible for the Child's injuries and

"relie[d] on the testimony of the medical provider, the Agency workers, and Father to establish that Mother was the primary care giver of the Child and did not present credible evidence to rebut this evidence." *Id.* The court concluded: "The Child was the victim of child abuse and DHS has met [its] burden by clear and convincing evidence that aggravated circumstances existed due to Mother's abuse of her Child and the seriousness of that injury." *Id.*

Mother filed a timely appeal. The "Order in Question" section of Mother's Brief, at 2, confirms that Mother's appeal challenges only the Aggravated Circumstances Order, and not the Order of Adjudication – Child Not Dependent, even though the Order of Adjudication transferred legal and physical custody of the Child to Father.

Mother now presents five issues for our review:

1. Did the [family] court commit an error of law by entering an Order finding aggravated circumstances as to [Mother] where the [family] court found that the [C]hild was not dependent?

2. Did the [family] court commit an error of law and abuse of discretion by finding child abuse and aggravated circumstances as to [Mother] where [DHS] failed to prove by clear and convincing evidence that the injury to the [C]hild was the result of child abuse rather than accidental injury?

3. Did the [family] court commit an error of law and abuse of discretion by entering an Order finding child abuse and aggravated circumstances as to [Mother] where DHS failed to prove by clear and convincing evidence that the [Child] was in the care and custody of [Mother] at the time that the [C]hild suffered the injury?

4.      Did the [family] court commit an error of law and abuse of discretion by applying the presumption of perpetrator's identity under [23] Pa.C.S. § 6381(d) to [Mother] where DHS failed to prove the existence of child abuse?

5.      Did the [family] court commit an error of law and abuse of discretion by finding child abuse and aggravated circumstances as to [Mother] where DHS failed to prove by clear and convincing evidence that [Mother] committed physical neglect?

Mother's Brief at 4.

In *L.Z.*, the Supreme Court stated:

"The standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." ***In re R.J.T.***, 608 Pa. 9, [27], 9 A.3d 1179, 1190 (Pa. 2010).  We review for abuse of discretion.

*L.Z.*, 111 A.3d at 1174.  In addition, we have observed:

In dependency proceedings our scope of review is broad. . . . Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate.

***In re C.B.***, 861 A.2d 287, 294 (Pa. Super. 2004) (quoted citation omitted),

***appeal denied***, 871 A.2d 187 (Pa. 2005).

## Aggravated Circumstances

Mother's first issue questions whether the family court had the authority to make a finding that the Child was subject to aggravated circumstances under the Juvenile Act even though the court found that the

Child was not dependent under that Act.[10]  So far as we have been able to determine, this is a question of first impression.  It is a question of law as to which our review is plenary and *de novo*.  **In re G.D.**, 61 A.3d 1031, 1036-37 (Pa. Super. 2013) (citation omitted).  We conclude that the family court did not have authority to make a finding of aggravated circumstances absent a finding of dependency.

We begin with a review of the relevant statutory provisions.  The Juvenile Act was enacted, insofar as is relevant here, "[t]o provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of [the Act]."  42 Pa.C.S. § 6301(b)(1.1).  The statute therefore covers "only those children who come **within** [its] provisions" and not all children.  **Commonwealth v. Davis**, 479 A.2d 1041, 1045 (Pa. Super. 1984) (emphasis in original), **aff'd**, 510 A.2d 722 (Pa. 1985) (*per curiam*).  Apart from juvenile delinquency and similar proceedings that are not at issue here, the Juvenile Act provides that it "shall apply exclusively to . . . [p]roceedings in which a child is alleged to be . . . dependent."  42 Pa.C.S. § 6303(a)(1).  A child is "dependent" if he or she:

> (1) is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals . . .;

---

[10] This issue was included in Mother's Rule 1925(b) Statement of Errors, **see** Family Ct. Op., 11/14/16, at 1-2, but the family court did not address the issue in its opinion or orders.

(2) has been placed for care or adoption in violation of law;

(3) has been abandoned by his parents, guardian, or other custodian;

(4) is without a parent, guardian, or legal custodian;

(5) while subject to compulsory school attendance is habitually and without justification truant from school;

(6) has committed a specific act or acts of habitual disobedience of the reasonable and lawful commands of his parent, guardian or other custodian and who is ungovernable and found to be in need of care, treatment or supervision;

(7) has committed a delinquent act or crime, other than a summary offense, while under the age of ten years;

(8) has been formerly adjudicated dependent, and is under the jurisdiction of the court, subject to its conditions or placements and who commits an act which is defined as ungovernable in paragraph (6);

(9) has been referred pursuant to section 6323 (relating to informal adjustment), and who commits an act which is defined as ungovernable in paragraph (6); or

(10) is born to a parent whose parental rights with regard to another child have been involuntarily terminated under 23 Pa.C.S. § 2511 (relating to grounds for involuntary termination) within three years immediately preceding the date of birth of the child and conduct of the parent poses a risk to the health, safety or welfare of the child.

*Id.* § 6302.

A child dependency proceeding under the Juvenile Act is instituted by the filing of a petition alleging "[t]he facts which bring the child within the jurisdiction of the court and this [Act], with a statement that it is in the best interest of the child and the public that the proceeding be brought." 42

Pa.C.S. § 6334(a)(1); *see also id.* § 6321(a)(3); Pa.R.J.C.P. 1200. After hearings required by the statute, a court may find a child dependent by clear and convincing evidence. 42 Pa.C.S. § 6341(a), (c). If the court finds the child dependent, then it then has a broad range of options for disposition of the child's case in a way that best assures "the safety, protection and physical, mental, and moral welfare of the child," including options to place the child in the custody of persons other than the child's parents. *See id.* § 6351(a). However, "[i]f the court finds that the child is not a dependent child . . .[,] it shall dismiss the petition and order the child discharged from any detention or other restriction theretofore ordered in the proceeding." *Id.* § 6341(a).[11]

The Juvenile Act provides that a dependency petition may allege that there are "aggravated circumstances" relating to an allegedly dependent

_____

[11] The Rules of Juvenile Court Procedure further provide:

> (2) *No dependency*. If the court finds the child not to be dependent or the court finds a parent ready, willing, and able to provide proper parental care or control, the court shall:
>
> > (a) dismiss the petition;
> >
> > (b) order the child to be discharged from custody and any restrictions ordered in the proceedings; and
> >
> > (c) enter an order identifying individual(s) who will have the legal and physical custody until such order is modified by further order of the court.

Pa.R.J.C.P. 1409(A)(2).

child. 42 Pa.C.S. § 6334(b). The Act defines "aggravated circumstances" as

"[a]ny of the following circumstances":

> (1) The child is in the custody of a county agency and either:
>
>> (i) the identity or whereabouts of the parents is unknown and cannot be ascertained and the parent does not claim the child within three months of the date the child was taken into custody; or
>>
>> (ii) the identity or whereabouts of the parents is known and the parents have failed to maintain substantial and continuing contact with the child for a period of six months.
>
> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.
>
> (3) The parent of the child has been convicted of any of the following offenses where the victim was a child: [list of offenses omitted].
>
> (4) The attempt, solicitation or conspiracy to commit any of the offenses set forth in paragraph (3).
>
> (5) The parental rights of the parent have been involuntarily terminated with respect to a child of the parent.
>
> (6) The parent of the child is required to register as a sexual offender . . . or to register with a sexual offender registry in another jurisdiction or foreign country.

*Id.* § 6302.

The Juvenile Act provides that if a county's children and youth social service agency "reasonably believes that aggravated circumstances exist, it shall file the appropriate petition as soon as possible but no later than 21 days from the determination by the county agency that aggravated

circumstances exist." 42 Pa. C.S. § 6334(b). The agency's petition must "include a statement of the facts the county agency . . . intends to prove to support the allegation." ***Id.*** If such an allegation is made, the court has the following obligation when it adjudicates the child's dependency:

> If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as required in section 6351(e)(3) (relating to [permanent placement upon] disposition of dependent child).

***Id.*** § 6341(c.1).[12]

Mother contends that the family court "committed an error of law by entering an Order finding aggravated circumstances as to [Mother] where the court found that the [C]hild was not dependent." Mother's Brief at 10. She continues:

> The [C]hild, J.M., was found not dependent by the [f]amily [c]ourt in this case. . . . The Juvenile Act does not provide for free-standing determinations of aggravated circumstances by the trial court. . . . "If the county agency or the child's attorney alleges the existence of aggravated circumstances ***and the court determines that the child is dependent***, the court shall also determine if aggravated circumstances exist." 42 Pa.C.S. §

---

[12] In ***In re L.V.***, 127 A.3d 831, 839 (Pa. Super. 2015), we observed that a finding of aggravated circumstances under Section 6341(c.1) "permits the trial court to consider the immediate termination of attempts at reunification between a child . . . and her family." ***See In re M.S.***, 980 A.2d 612, 620 (Pa. Super.), ***appeal denied***, 985 A.2d 220 (Pa. 2009).

6341(c.1)(emphasis added). There is not provision for a ruling of aggravated circumstances unless and until the court has determined that the child is dependent. . . . The Pennsylvania Rules of Juvenile Court Procedures likewise clearly provide that a finding of dependency is to precede any ruling on aggravated circumstances. . . . The ordering of events envisioned by the statute and the rules makes good sense in light of the object of the Juvenile Act and the purpose of a dependency proceeding: to ensure the safety of the child. . . . Since the trial court in this matter ruled that the Child J.M. was not dependent and dismissed the petition, the court did not have authority to proceed to rule on the issue of aggravated circumstances which was alleged in that petition, and it was an error of law for the court to make a ruling on this issue.

Mother's Brief at 10-12.

In response, DHS argues that "Section 6341(c.1) merely states that where aggravated circumstances are alleged and the [c]ourt finds the Child dependent, the [c]ourt must determine if aggravated circumstances exist." DHS's Brief at 39. DHS urges, however, that "nothing in the Juvenile Act prohibits the Court from making such a finding where the facts meet the definition within the Act." *Id.* In DHS's view, Mother's argument rests on a comment to one of the Pennsylvania Rules Juvenile Court Procedure, which, according to DHS, conflicts with both Section 6341(c.1) and the Juvenile Court Procedure Rules themselves. Finally, DHS points out that it believes the Child would have been adjudicated dependent if it were not for Father's willingness to accept custody of him. In sum, DHS contends that a court may find aggravated circumstances absent a finding of dependency.

In construing a statute, we are guided by the Statutory Construction Act, which provides:

> (a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions.
>
> (b) When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

1 Pa.C.S. § 1921. "As a general rule, the best indication of legislative intent is the plain language of a statute." **Commonwealth v. McFadden**, 156 A.3d 299, 305 (Pa. Super. 2017) (quoting **Commonwealth v. Bradley**, 834 A.2d 1127, 1132 (Pa. 2003)).

Here, the plain language of the Juvenile Act provides that a court may make a finding of aggravated circumstances only if it finds that a child is dependent. Section 6341(c.1) states: "If the county agency or the child's attorney alleges the existence of aggravated circumstances **and the court determines that the child is dependent**, the court shall also determine if aggravated circumstances exist." 42 Pa.C.S. § 6341(c.1) (emphasis added). The statute contains no provision authorizing findings on aggravated circumstances if no finding of dependency is made.

This interpretation makes sense in light of the statutory scheme under the Juvenile Act as a whole. The Juvenile Act provides for allegations of aggravated circumstances only in connection with the filing of a dependency petition, and not as a freestanding basis for relief. If a child is found to be dependent, the Juvenile Act uses a further finding regarding the existence of aggravated circumstances as a basis for determining where to place the

dependent child under Sections 6341 and 6351. Although a court otherwise might consider reasonable efforts to return a dependent child to his or her family, a finding of aggravated circumstances requires that the court carefully evaluate whether to follow such a course under Section 6341(c.1). Indeed, this restraint on placement is the **only** purpose of an aggravated circumstances finding. The provisions regarding aggravated circumstances were added to the Juvenile Act in 1998 to comply with federal laws addressing Congressional concerns that a child found to be dependent not then be returned to an abusive family. **See In re S.B.**, 833 A.2d 1116, 1122-23 & n.6 (Pa. Super. 2003), **appeal denied**, 856 A.2d 835 (Pa. 2004). The added provisions, culminating in Section 6341(c.1), enable the family court to prevent such a result.

If a child is **not** found to be dependent, however, there will be no placement decision that requires consideration of information about aggravated circumstances, and there thus will be no need for such a finding. Section 6341(a) of the Juvenile Act confirms our conclusion by providing that if a child is not found to be dependent, the court "shall dismiss the petition and order the child discharged from any detention or other restriction theretofore ordered in the proceeding." 42 Pa.C.S. § 6341(a). Section 6341(a) makes clear that a finding of no dependency must result in a termination of the dependency proceedings, rather than a continuation of proceedings to find and then address aggravated circumstances.

The Rules of Juvenile Court Procedure that have been promulgated by the Supreme Court to govern dependency proceedings are consistent with this interpretation of the Act. Rule 1705(A) provides:

> *Finding after adjudication of dependency.* **After** a finding of dependency pursuant to Rule 1409, the court shall determine if aggravated circumstances exist.

Pa.R.J.C.P. 1705(A) (emphasis added). An official comment to Rule 1705 states: "Under paragraph (A), the court is to find a child dependent before determining if aggravated circumstances exist. **See** 42 Pa.C.S. § 6341(c.1)." Pa.R.J.C.P. 1705(A) cmt. In contrast, Rule 1409(A)(2) provides, "If the court finds the child not to be dependent or the court finds a parent ready, willing, and able to provide proper parental care or control, the court shall (a) dismiss the petition . . . ." Pa.R.J.C.P. 1409(A)(2).

DHS contends that the comment to Rule 1705 somehow conflicts with Rule 1401, which provides:

> Under these rules and the Juvenile Act, 42 Pa.C.S. § 6301 *et seq.*, a determination for each case requires separate and distinct findings. First, the court is to hold an adjudicatory hearing, governed by Rule 1406 or accept stipulations, governed by Rule 1405. Second, after hearing the evidence or accepting the stipulations, the court is to make specific findings on the petition as to each allegation pursuant to Rule 1408, stating with particularity the allegations proven by clear and convincing evidence. Third, after entering its findings, the court is to determine if the child is dependent, pursuant to Rule 1409. **If aggravated circumstances are alleged, the court is to determine if aggravated circumstances exist, pursuant to Rule 1705.** After the court has made these findings and if the court finds that the child is dependent, the court is to hold a dispositional hearing as provided for in Rule 1512 and is to enter a dispositional order under Rule 1515. Nothing in these rules

precludes the court from making these determinations at the same proceeding as long as the requirements of each rule are followed.

Pa.R.J.C.P. 1401 (emphasis added).

There is no conflict. Rule 1401 says that a finding of aggravated circumstances is to be made "pursuant to Rule 1705," which says that such a finding is to be made only "[a]fter a finding of dependency." Pa.R.J.C.P. 1705(A). Moreover, at the time the Supreme Court promulgated the Juvenile Procedure Rules, it published an Explanatory Report that made this same point: "Before the court is able to find aggravated circumstances, the court must enter a finding of dependency pursuant to Rule 1409." ***See*** Order Approving the Rules of Juvenile Court Procedure — Dependency Matters (Pa. Aug. 21, 2006), 36 Pa. Bull. 5571 (Sept. 2, 2006), *http://www .pabulletin.com/secure/data/vol36/36-35/1721.html* (order approving rules and mandating their publication with the Explanatory Report); ***id.*** 5599, 5605, *http://www.pabulletin.com/secure/data/vol36/36-35/1721c.html* (Explanatory Report).

We therefore hold that the family court had no authority to enter an order finding aggravated circumstances once it determined the Child was not

dependent. Accordingly, the court's finding of aggravated circumstances must be reversed.[13]

### Child Abuse

As part of its Aggravated Circumstances Order, the family court made an "additional finding" that the Child is a victim of Mother's child abuse under Section 6303 of the Child Protective Services Law, 23 Pa. C.S. § 6303. Mother presents various challenges to this finding.

We begin by noting that although we have vacated the family court's finding of aggravated circumstances because it was not authorized by the Juvenile Act, our decision on that issue does not automatically vacate the finding of child abuse as well. The trial court was authorized to make a separate finding of child abuse under the Child Protective Services Law, which provides that a local child services agency investigating child abuse may institute dependency proceedings in which it petitions for a finding of child abuse. 23 Pa. C.S. § 6370(b)(2)(i). **See L.Z.**, 111 at 1176 ("As part of the dependency adjudication, a court may find a parent to be the perpetrator of child abuse"); **In re J.R.W.**, 631 A.2d 1019, 1021-25 (Pa. Super. 1993). In contrast to its treatment of aggravated circumstances, nothing in the Juvenile Act, including in Section 6341(c.1), conditions a finding of child abuse in such a dependency proceeding on a finding that a

_____

[13] In view of this disposition, we need not reach the portions of Appellant's second, third, and fifth issues regarding the finding of aggravated circumstances.

child is dependent. DHS' petition here included a child abuse allegation under the Child Protective Services Law, and the trial court therefore acted properly in adjudicating that issue.[14]

Mother maintains:

The [family] court committed an error of law and abuse of discretion by finding child abuse . . . as to [Mother] where [DHS] failed to prove by clear and convincing evidence that the injury to the subject child was the result of child abuse rather than accidental injury.

Mother's Brief at 12. Mother also contends that "[t]he trial court committed an error of law and abuse of discretion by applying the presumption of perpetrator's identity under [23] Pa.C.S. § 6381(d)[15] to [Mother] where DHS failed to prove the existence of child abuse." Mother's Brief at 23.

_____

[14] Even if a finding of child abuse does not cause further civil or criminal proceedings to be instituted against the abuser, it still can have significant consequences. As the Supreme Court has observed, "a dependency court's finding that an individual perpetrated abuse allows for the filing of a founded report of child abuse with the Department of Public Welfare and inclusion in the statewide ChildLine Registry, which *inter alia* restricts an individual's ability to engage in employment related to children." *L.Z.*, 111 A.3d at 1169.

[15] In her brief, Mother referred to this section as "**42** Pa.C.S. § 6381(d)." Mother's Brief at 23. No such statute exists, and we are confident that Mother intended to refer to **23** Pa.C.S. § 6381(d), a provision of the Juvenile Act dealing with proof in child abuse cases. Section 6381(d) provides:

Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

*(Footnote Continued Next Page)*

In ***L.Z.***, 111 A.3d at 1174, the Supreme Court discussed the requirements to prove the two issues in a child abuse case. "[A] petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard," but if the court finds that abuse occurred, "the identity of the abuser need only be established through *prima facie* evidence in certain situations." ***Id.*** Here, much of the focus in the family court was on identifying an abuser, as the court examined competing claims about which parties had custody of the Child at which times. On appeal, however, Mother first seeks review of the primary finding that DHS proved abuse by clear and convincing evidence.

"Child abuse" encompasses a broad range of misconduct under the Child Protective Services Law. Here, DHS contends that it established child abuse under the following provisions:

> The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

---

*(Footnote Continued)* ————————————

***See generally L.Z.***, 111 A.3d at 1175-86. With respect to this provision, Mother argues:

> The [family] court, in its Opinion, did not cite any direct evidence, much less clear and convincing evidence, that Child was in Mother's custody when the injury was incurred. Instead, the trial court discusses the fact that, under certain circumstances, the identity of an abuser may be established by prima facie evidence.

***Id.*** (citing Family Ct. Op., 11/14/16, at 17 (citing ***L.Z.***, 111 A.3d at 1174)).

(1) Causing bodily injury to a child through any recent act or failure to act.

\* \* \*

(5) Creating a reasonable likelihood of bodily injury to a child through any recent act or failure to act.

\* \* \*

(7) Causing serious physical neglect of a child.

23 Pa.C.S. § 6303(b.1)(1), (5), (7). Section 6303(a) defines "intentionally," "knowingly," and "recklessly" as "hav[ing] the same meaning as provided in 18 Pa.C.S. § 302 (relating to general requirements of culpability)," which provides:

(1) A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

(ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

(3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and

- 29 -

unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b). Section 6303(a) defines "bodily injury" and "serious physical neglect" as follows:

> **"Bodily injury."** Impairment of physical condition or substantial pain.
>
> \* \* \*
>
> **"Serious physical neglect."** Any of the following when committed by a perpetrator that endangers a child's life or health, threatens a child's well-being, causes bodily injury or impairs a child's health, development or functioning:
>
> (1) A repeated, prolonged or egregious failure to supervise a child in a manner that is appropriate considering the child's developmental age and abilities.
>
> (2) The failure to provide a child with adequate essentials of life, including food, shelter or medical care.

23 Pa.C.S. § 6303(a).

The question is whether DHS proved child abuse under these provisions by clear and convincing evidence. "Clear and convincing evidence" requires:

> that the witnesses must be found to be credible; that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order; and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries

a clear conviction to the mind or carries a clear conviction of its truth.

*In re Novosielski*, 992 A.2d 89, 107 (Pa. 2010) (citations and internal brackets omitted). The cases exemplify the heavy burden imposed by this standard.[16]

In *In re Read*, 693 A.2d 607, 610-11 (Pa. Super. 1997), *appeal denied*, 723 A.2d 1025 (Pa. 1998), the juvenile court found that twin infants with bone fractures were the victims of child abuse. The treating physician testified that he could not definitively state whether the injuries were caused by abuse or by an accident, and the parents gave no explanation for the injuries. *Id.* at 611. The parents had immediately sought medical care for the children. *Id.* Upon review, this Court reversed the finding of abuse, stating:

> A thorough review of the testimony simply does not rise to the level required to declare these children abused. It is an unwarranted conclusion to find abuse simply because the parents did not introduce any explanations for the injuries. The evidence must show by clear and convincing evidence that the children were abused and that the injuries were not accidental. The testimony here fails to support a conclusion that the injuries were not accidental. The only conclusive fact is that these children suffered bone fractures. The medical testimony and the testimony from CYS was inconsistent as to whether these injuries

---

[16] The cases we discuss here predate amendments that expanded the definition of "child abuse" under the Child Protective Services Law, which, as each cited case relates, previously required proof only of a "nonaccidental serious physical injury." We do not consider these cases as controlling with respect to the current meaning of "child abuse." Rather, we discuss them as illustrations of our application of the clear and convincing evidence standard in child abuse cases.

where in fact accidental. **Innuendo and suspicion alone are not enough to compel a finding of child abuse.**

*Id.* at 611-12 (emphasis added).

Similarly, in *In re C.R.S.*, 696 A.2d 840, 843-44 (Pa. Super. 1997), the child's treating physician testified that he could not definitively diagnose whether the trauma suffered by the child was accidental or nonaccidental. Four additional expert physicians, including two pediatricians and a pediatric ophthalmologist, who reviewed the child's medical records, testified that the child's injuries could have been accidental but that they could not make a definitive statement as to their cause. *Id.* at 844-45. The child's regular treating pediatrician testified that she had observed no earlier symptoms of abuse. *Id.* at 845. Based upon an independent review of the record, this Court disagreed with the trial court's inference that the medical testimony established that the child was abused. *Id.* at 844. "A thorough review of the testimony indicates that there was no clear and convincing evidence that C.R.S. was abused or that his injuries were non-accidental." *Id.* at 845. Thus, we reversed the trial court's finding of abuse. *Id.* at 846.

The stark fact in this case is that there is no evidence clearly showing that the Child was abused. The Child had a fracture that, according to the medical testimony, was consistent with a normal accident involving a child of his age. Indeed, Dr. Deutsch testified that if Mother had told her that the Child had fallen on his outstretched arm, that would have been a satisfactory explanation to avoid any involvement by Child Protective Services. N.T.,

5/19/16, at 86-87. The fracture became a cause of concern only because Mother said she did not know what caused it and volunteered that there was a history of physical altercations involving Father's family. There is no evidence in this record — medical or otherwise — suggesting that this is a fracture that was more likely to have been caused by abuse than by an accident.

In the absence of such evidence, the child advocate argues that abuse was proven through the "conflicting histories" Mother provided regarding custody of the Child over the period when the fracture occurred. DHS's Brief at 25. According to the child advocate, Mother gave a "timeline of custody" that "misled both the hospital and DHS and blamed the paternal relatives for the Child's history." *Id.* The advocate points out that "[t]he Court rejected Mother's change in histories and multiple conflicting stories" and that Dr. Deutsch noted that such conflicts "were a 'red flag' for child abuse." *Id.* at 31 (citing N.T., 5/19/16, at 78-79). The advocate also argues that it was appropriate to find that the Child was the victim of abuse by Mother because Mother was the Child's custodial parent and was unable to explain the Child's injuries. *Id.* at 30-31.

With respect to the "conflicting histories," Mother points out that her testimony was never in conflict regarding the cause of the fracture; she consistently said she did not know how it happened. Mother's Brief at 18 (citing N.T. 7/25/16, at 29, 36). Our review of the record confirms this fact,

but it also confirms that Mother, whose ongoing hostility toward Paternal Grandmother is clear, speculated that Paternal Grandmother could be responsible for the injury. The CHOP report by Dr. Deutsch includes Mother's statement that "she is concerned that paternal grandmother injured [the Child's] arm intentionally on Friday afternoon after the altercation between mother and paternal grandmother." Ex. DHS-3 at 70. The record also shows that Mother provided conflicting information about when the Child was in her custody and when he was in the custody of Father and Paternal Grandmother, though much of the evidence about dates in the record seems simply to be confused. In light of the inconsistencies in the record, as well as its observations of Mother's demeanor, the family court concluded that Mother's testimony was not believable, that Mother "tried as best as she could to confuse," and Mother was "attempting to conceal what happened to the child while in her care and she is responsible for the injuries to the child while in her care." N.T., 7/25/16, at 44.

We are bound by the findings of the family court. *L.Z.*, 111 A.3d at 1174. But we are aware of no case that has ever held that such evidence is sufficient to prove child abuse under a standard requiring clear and convincing proof.[17] We have reviewed each of the cases cited to us by the

_____

[17] We need not reach the issue in light of our disposition, but we note that if it had properly found child abuse, the family court may have had greater leeway to then rely on less rigorous evidence to support a finding that Mother perpetrated the abuse, the primary focus of the hearing below. That
*(Footnote Continued Next Page)*

child advocate, and each of them found child abuse on the basis of far greater evidence than this.

In *L.Z.*, the child had a deep cut around his penis and bilateral bruising of his cheeks. 111 A.3d at 1167. A medical expert testified that the injuries could not have occurred in the way the family claimed (that the laceration was caused by the child tugging on his penis during a diaper change and the bruising was caused by a fall onto a table). *Id.* The Court held that the injuries were proven to be abuse on the basis of the medical testimony. *Id.* at 1175.

In *In re A.H.*, 763 A.2d 873 (Pa. Super. 2000), the treating physician testified that the mother's explanation for her child's bone fractures was "inconsistent with the medical evaluation," and the doctor had no doubt that those injuries were the result of abuse. *Id.* at 876. "In addition, the doctor found a healed fracture of the left radius, which was inflicted approximately one to two months prior to the examination, and a fracture of the upper humerus of the left arm, which was inflicted within the two to four week period prior to the exam." *Id.* We concluded there was "ample evidence in the record to support the court's findings" of child abuse. *Id.*

In *In re R.P.*, 957 A.2d 1205 (Pa. Super. 2008), a child presented with more than 100 bruises over his entire body. The parents offered a

*(Footnote Continued)* ────────────
finding would not require clear and convincing evidence. *See L.Z.*, 111 A.3d at 1174.

"multitude" of "ever-changing and often conflicting" explanations for the child's injuries, including a fall from a trampoline. An examination showed that the child had multiple injuries of various ages, indicating that harm had occurred over a long period of time. *Id.* at 1208. A forensic pediatrician testified that the child had "old bruises on specific areas that are concerning for abuse and old fractures" and that the child's injuries were inconsistent with the parents' explanation as to how the most recent and most serious injury had occurred. *Id.* at 1215-16. A second forensic pediatrician specifically testified that the child's injuries were "non-accidental." *Id.* at 1223. This Court concluded that "the trial court was correct in adjudicating [that] there was clear and convincing evidence that R.P. was the victim of abuse." *Id.* at 1213.

In *In re J.O.V.*, 686 A.2d 421 (Pa. Super. 1996), a dependency proceeding, the four-month-old child had suffered fractures on multiple occasions, indicating a pattern of abusive behavior. *Id.* at 422. The parents' inability to explain any of the injuries proved that the child was without proper parental care or control, enabling a finding of dependency.

In *J.R.W.*, 631 A.2d 1019, the two-month-old child suffered multiple fractures and head injuries. In addition to the fact "that the parents provided various, inconsistent reasons for the injuries . . . [that were] inconsistent with the evidence and medical testimony presented," *id.* at 1021, there was medical evidence of trauma by an external source: that is,

"several experts testified **without qualification** that this child had been seriously abused." *Id.* at 1025 (emphasis in original).

In *In re Frank W.D.*, 462 A.2d 708 (Pa. Super. 1983), the medical testimony was that the child's broken arm was caused by a direct trauma involving a great deal of force – at least ten times the child's body weight. *Id.* at 710. When a babysitter claimed that the break occurred when he grabbed the child's arm to prevent a fall, a doctor testified, "this fracture could not have been caused by the way [the babysitter] described the incident and I am a hundred percent certain of that." *Id.*

We also researched actions arising under an earlier version of the child abuse statute that involved parents or other caregivers who could not explain the cause of the child's injuries or who gave conflicting explanations. In *K.N. v. Commonwealth, Dep't of Pub. Welfare*, 554 A.2d 994, 996 (Pa. Cmwlth.), *appeal denied*, 568 A.2d 1250 (Pa. 1989), the medical expert testified that "the severity of [the child]'s facial bruising was inconsistent with" the explanation that the parents had originally given to the hospital for those injuries. The doctor continued that the child's injuries unequivocally were the result of abuse, not an accident. *Id.* A social worker also testified that, when speaking to her, the parents "had been inconsistent in their rendition of the events leading to the child's injuries." *Id.* The Commonwealth Court affirmed the finding of child abuse, concluding that it was "supported by substantial evidence." *Id.* at 998.

In **K.S. v. Commonwealth, Dep't of Pub. Welfare**, 564 A.2d 561, 562, 564 (Pa. Cmwlth. 1989), the parents offered conflicting explanations for a laceration that the child had suffered, and neither parent could explain how the child suffered fractures of lower leg bones. The medical expert testified that the injuries were undoubtedly the result of abuse. **Id.** at 563. The Commonwealth Court affirmed the finding of child abuse. **Id.** at 562.

In **In re Sharpe**, 374 A.2d 1323, 1325 (Pa.Super. 1977), a mother "offered no plausible explanation for the cause of [her child's] injuries." After the mother brought the child to the hospital for a skin rash, the doctor discovered other harm, but the mother could offer no explanation for why she had not previously sought treatment for the child. **Id.** Additionally, further medical exams revealed signs of neglect "and social deprivation." **Id.** at 1325-26. This Court affirmed the finding that the child was "a deprived child." **Id.** at 1324.

In each of these cases, there was far more evidence of child abuse than has been presented here. In many of the cases, there was unequivocal medical evidence that the child's injury could not have been accidental; here, however, Dr. Deutsch, the only doctor who testified, stated that the Child's fracture is a type that often occurs in accidents involving children of his age and rendered no opinion that the Child was abused. In many of the cases, there was evidence of past injuries that reflected a history of abuse; here, however, there is no such history. And, significantly, when these

cases have relied on the fact that the caregiver gave incredible testimony, they have pointed to testimony seeking to explain the child's injury in a way contrary to the medical evidence. Here, Mother proffered no explanation of how the injury occurred, insisting that she did not know.

Clear and convincing evidence requires that a finding be based on testimony by credible witnesses who clearly relate facts that are "so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." ***Novosielski***, 992 A.2d at 107. There was no such testimony of abuse in this record. Rather, the evidence was only of an injury that commonly results from childhood accidents, a mother who said she did not know how that injury occurred, and conflicting testimony by that mother about who had custody at the time of the injury. Rather than finding the testimony clear, the trial court said it was "as muddy as the Mississippi can be." N.T., 7/25/16, at 44. The trial court said it did not believe Mother and inferred that she might be hiding something. ***See id.*** But suspicions are not a substitute for clear and convincing evidence. ***Read***, 693 A.2d at 612. Although the trial court was free to rely on its findings about Mother's testimony, it could not, as a matter of law, find that the Child was abused solely on that basis.

In sum, in light of the clear and convincing standard we are required to apply, we hold that the record lacks sufficient proof to enable a finding

that the Child was the victim of child abuse. Accordingly, we are constrained to reverse the finding of child abuse in this case. In light of this disposition, we need not address Mother's other issues.

We reverse the family court's July 25, 2016 "Aggravated Circumstances Order" and its findings of aggravated circumstances and child abuse.

Order reversed. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 6/27/2017