J-S19002-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN THE INTEREST OF: A.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: S.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 3353 EDA 2019 |

Appeal from the Order Entered November 5, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000402-2019


BEFORE:  BOWES, J., McCAFFERY, J., and MUSMANNO, J.

MEMORANDUM BY BOWES, J.:                    **FILED JULY 7, 2020**

S.S. ("Mother") appeals the November 5, 2019 order of disposition finding that she abused her daughter, A.B., as the term is defined in 23 Pa.C.S. § 6303.  We affirm.

A.B. was born in January 2014.  During February 2019, the Philadelphia Department of Human Services ("DHS") became involved with this family due to a report of medical neglect.  N.T., 6/20/19, at 16.  A.B. had previously been diagnosed with hypopituitarism, hypocalcemia, hypoglycemia, and hypoparathyroidism.  *Id*. at 28-30.  These conditions require life-essential medication and A.B. can experience seizures due to the failure to comply with the established medication regimen.  *Id*. at 31, 33, 60-61.  Specifically, A.B. requires thyroid hormone, growth hormone, hydrocortisone, cholecalciferol, and calcium carbonate.  *Id*. at 31-32, 36, 73-75.  Further, to combat against the onset of seizures when A.B.'s health is under stress, such as illness, fever,

vomiting, or surgery, a higher "stress dose" of hydrocortisone is required. *Id*. at 31-32.

Prior to the February 2019 hospitalization that is the genesis of this appeal, A.B. was admitted to St. Christopher's Hospital for Children ("St. Christopher's") in April, May, and August 2018, for a viral infection with mild low blood glucose, a urinary tract infection, and a seizure attributed to low calcium, respectively. During this period, Elizabeth Suarez, M.D., A.B.'s treating pediatric endocrinologist at St. Christopher's, trained then-twenty-three-year-old Mother to administer the correct dosages of the necessary medications. Specifically, Dr. Suarez reviewed A.B.'s medications with Mother during the April and August hospitalizations. N.T., 6/20/19, at 37-40. A follow-up discussion was scheduled for September 2018, but Mother failed to attend that review. *Id*. at 40-41.

A.B. returned to St. Christopher's on February 8, 2019, because of a hypoglycemic seizure, due to low blood glucose, and hypocalcemia, which is a condition caused by low calcium. N.T., 11/5/19, at 17-18; N.T., 6/20/19, at 30, 37-39, 46-47, 49; *see also* Exhibits DHS-4, DHS-5. The child was unresponsive at the home and had to be revived by paramedics who administered an emergency dose of medication. It was apparent to the medical staff that Mother had not administered the appropriate doses of medications to A.B. to counter the physical stress associated with abdominal pain, vomiting, and loose stools that plagued her daughter in the days prior to the February admission. *See* N.T., 11/5/19, at 18, 28; N.T., 6/20/19, at

46, 63; *see also* Exhibits DHS-2, DHS-4, DHS-5, DHS-6. For example, Mother admitted giving A.B. less than the recommended daily amount of hydrocortisone and discontinued calcitriol and calcium carbonate. N.T., 11/5/19, at 18-19, 28. Indeed, Ghada Naji, M.D., the emergency department doctor who treated A.B. on February 8, 2019, subsequently testified that it was apparent that Mother was not medicating A.B. appropriately. *Id*. at 29-30.

On February 11, 2019, DHS generated a Child Protective Service ("CPS") report alleging that Mother perpetrated child abuse against A.B. by failing to provide medical treatment or care. *Id*. at 16-17; *see also* Exhibit DHS-2. The CPS report was indicated, finding substantial evidence to support the allegation that Mother failed to provide medical treatment or care and that the child suffered substantial pain, injury, and impairment due to abuse or neglect.[1] N.T., 11/5/19, at 38; N.T., 6/20/19, at 23; *see also* Exhibit DHS-6. Upon her discharge from the hospital on February 11, 2019, A.B. was permitted to return home to Mother's care under the supervision of the maternal grandmother and maternal aunt, who signed the agency's safety plan that facilitated reunification. DHS also provided the family in-home services and nursing.

---

[1] An "indicated" designation refers to an agency's finding of substantial evidence of abuse based upon available medical evidence, investigation, or the admission of a perpetrator. 23 Pa.C.S. § 6303.

On March 7, 2019, DHS filed a dependency petition that included allegations of abuse pursuant to 23 Pa.C.S. § 6303. Nine months later, the agency withdrew the petition because Mother successfully remediated the underlying medication issues. DHS explained its decision to the juvenile court as follows, "Your Honor, based upon the compliance for the past nine months with both In-home Services and DHS Nursing, . . . the dependency issues have been remediated so the petition before the [c]ourt, [can be] withdrawn." N.T., 11/5/19, at 64.

Notwithstanding the eventual resolution of the dependency proceeding based upon Mother's subsequent remedial conduct, the court held additional hearings on June 20, 2019, and November 5, 2019, to resolve the underlying allegations of abuse stemming from the February 2019 CPS report.[2] DHS presented, *inter alia*, the testimony of Judith Tertus, the CUA case manager, Terez Hunter, DHS Supervisor for Investigation, Dr. Suarez, who testified as an expert in pediatric endocrinology, and Dr. Naji. Mother was present and represented by counsel.

_____

[2] The finding of child abuse is not contingent upon an accompanying adjudication of dependency. **In re Interest of J.M.**, 166 A.3d 408, 422 (Pa.Super. 2017) ("[N]othing in the Juvenile Act . . . conditions a finding of child abuse in such a dependency proceeding on a finding that a child is dependent."). While Mother does not contest this proposition, the child advocate and guardian *ad litem* challenge the juvenile court's authority to enter a finding of abuse absent a concomitant adjudication of dependency. Since the issue was not presented before the juvenile court, it is waived. Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.").

On November 5, 2019, the juvenile court entered its finding that Mother perpetrated child abuse as defined by 23 Pa.C.S. § 6303 of the Child Protective Services Law ("CPSL"). Accordingly, the CPS report was founded.[3] Mother filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Mother presents the following issues for our review:

1. Did the trial court err as a matter of law and abuse its discretion when it based its finding of child abuse under the Child Protective Services Law on expert medical testimony which failed to satisfy the legal standard of knowing, intentional and reckless as required by 23 Pa.C.S. [§ 6303]?

2. Did the trial court err as a matter of law and abuse its discretion when it made a finding of child abuse where [DHS] failed to prove by clear and convincing evidence that the child was abused as defined by 23 Pa.C.S. [§ 6303]?

Mother's brief at 8.

We review the juvenile court's determination for an abuse of discretion. ***In re Interest of J.M.***, 166 A.3d 408 (Pa.Super. 2017). As the alleged abuse occurred in February 2019, the current version of CPSL, which became

---

[3] The CPSL defines a founded report, in pertinent part, as:

A child abuse report involving a perpetrator that is made pursuant to this chapter, if any of the following applies:

(1)  There has been a judicial adjudication based on a finding that a child who is a subject of the report has been abused and the adjudication involves the same factual circumstances involved in the allegation of child abuse.

23 Pa.C.S. § 6303(a).

effective on June 12, 2018, controls our review. The statute defines child abuse, in relevant part, as follows:

> **(b.1) Child abuse.--**The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:
>
> . . . .
>
> (7)    Causing serious physical neglect of a child.

23 Pa.C.S. § 6303(b.1) (footnote omitted). Serious physical neglect includes, *inter alia*, "[t]he failure to provide a child with adequate essentials of life, including food, shelter or medical care . . . when committed by a perpetrator that endangers a child's life or health, threatens a child's well-being, causes bodily injury or impairs a child's health, development or functioning[.]" 23 Pa.C.S. § 6303(a).

In ***In the Interest of J.R.W.***, 631 A.2d 1019, 1023 (Pa.Super. 1993), this Court stressed that the juvenile court's determination of whether child abuse occurred must be supported by clear and convincing evidence. ***Id***.

> [T]he clear and convincing evidence necessary to find dependency, [sic] has been imposed by the Legislature as the standard which the Juvenile Court must apply in deciding abuse cases. . . . There is no conflict, constitutional or otherwise, with the clear and convincing evidence standard imposed by the Act to establish child abuse.

***Id***. ***see also In re L.Z., supra*** at 1174.

Mother argues that the juvenile court erred in adjudicating her a perpetrator of abuse because DHS failed to demonstrate that her behavior was knowing, intentional, or reckless. Mother's brief at 15-21. She asserts

that "reasonable consideration of the evidence produced at trial suggests" that her failure to administer the correct dosages of medicine was the result of negligence rather than knowing, intentional, or reckless conduct, and is therefore insufficient to support a finding of child abuse. *Id*. at 20. Critical to Mother's argument is the fact that St. Christopher's Hospital for Children, with full knowledge and access to A.B.'s medical history, released A.B. to her care. *Id*. at 17. Additionally, Mother highlights testimony that A.B.'s medication regimen was complicated and that there were concerns as to Mother's understanding of the appropriate dosage and its consequences. *Id*. Mother also relies upon Dr. Suarez's testimony that, had Mother been persistently non-compliant with A.B.'s medication regimen, A.B. would have been hospitalized much more frequently. *Id*. Essentially, Mother argues that the Commonwealth did not establish the *mens rea* for child abuse.

The CPSL refers to the Crimes Code's definition of knowing as outlined in 18 Pa.C.S. § 302(b)(2), which provides as follows:

> (2) A person acts knowingly with respect to a material element of an offense when:
>
>> (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and
>>
>> (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S. § 6303(b)(2).

At the conclusion of the hearing on November 5, 2019, the juvenile court summarized its conclusion by stating that, notwithstanding Mother's understanding of her daughter's condition, access to medical advice from the staff at St. Christopher's, and the prior successful administration of proper dosages of the medication, Mother knowingly reduced her child's medication, thereby placing her daughter's life in danger by administering less than the required amount. N.T., 11/5/19, at 61-62.

Our review of the certified record belies Mother's contention that the evidence was insufficient to sustain the finding by clear and convincing evidence that Mother's actions constituted child abuse. Indeed, contrary to Mother's protestations, the certified record supports the juvenile court's twin findings that A.B. was the victim of abuse by serious physical neglect as defined by the CPSL and that Mother knowingly perpetrated the abuse by failing to administer the correct doses of medication to A.B..

Dr. Suarez, A.B.'s treating endocrinologist, testified that while A.B.'s condition is normally controlled by the daily administration of various doses of medication, if A.B.'s health is placed under stress, such as fever, surgery, or vomiting, she requires a higher dose of hydrocortisone, typically by injection. N.T., 6/20/19, *Id*. at 29-32, 36. While Dr. Suarez stated that she had not previously found Mother noncompliant with the administration of A.B.'s medication, she conceded that improper stress doses contributed to two of A.B.'s hospitalizations during 2018, and that the incidents prompted the hospital staff to review with Mother A.B.'s medication regimen during April,

May, and August 2018. *Id*. at 37-39, 66, 73. Likewise, Mother was able to contact Dr. Suarez or the endocrinology staff at St. Christopher's with questions or concerns as to medications, but she did not. *Id*. at 40. In sum, Dr. Suarez, opined to a reasonable degree of medical certainty that the hypoglycemic seizure would not likely have occurred had Mother provided A.B. with the correct amount of her medications. *Id*. at 49-50, 62.

Similarly, Dr. Naji, the doctor who treated A.B. on February 8, 2019, testified that Mother admitted to the hospital staff that she had given A.B. less than the prescribed maintenance dose of hydrocortisone, and that she had discontinued A.B.'s prescribed calcium medication altogether. N.T., 11/5/19, at 19, 29-30. She added that Mother reduced the prescribed maintenance dose of hydrocortisone and neglected to administer the stress doses despite the fact that A.B. exhibited stress symptoms approximately four days before her February 2019 hospitalization for the seizure. *Id*. at 19-20, 21-22.

DHS Supervisor Terez Hunter testified about DHS's investigation of the February 11, 2019 CPS report. In sum, she explained to the juvenile court that DHS discovered "a pattern that the medication was not being properly administered or the prescriptions were not being properly filled or kept current." *See* N.T. 11/5/19 at 45-46. As it relates to the decision to permit A.B. to return home following her discharge from St. Christopher's, Ms. Hunter explained that, after consulting with the hospital social worker and the DHS nurse, it was determined that the safety plan with in-home services would be

sufficient because the maternal grandmother and aunt would help Mother monitor and administer all medications.  N.T., 6/20/19, 24-25.

Based on the foregoing evidence, the juvenile court found clear and convincing evidence that A.B. was the victim of child abuse by serious physical neglect as a result of Mother's knowing deprivation of medication.  Upon careful review of the record, we discern no abuse of discretion with the juvenile court's finding of abuse.

First, it cannot be gainsaid that Mother failed to provide then-five-year-old A.B. with the adequate essentials of life, *i.e.*, proper medical care, which endangered the child's well-being.  The certified record bears out that Mother failed to provide A.B. with the correct doses of hydrocortisone and that the resulting hypoglycemic seizure, which required her to be revived by paramedics before being transported to the hospital, would not likely have occurred had Mother provided A.B. with the right amount of medication.  The failure to provide adequate medical care is tantamount to serious physical neglect insofar as it threatened A.B.'s life.  *See Interest of T.G.*, 208 A.3d 487, 495-96 (2019 Pa. Super 2019) (finding serious physical neglect where mother failed to provide daughter prescribed fortified diet that was essential to her wellbeing).  Hence, the record confirms that A.B. suffered serious physical neglect when Mother failed to provide her with prescribed medication that was essential to her life, and resulted in a hypoglycemic seizure.

The record also sustains the court's finding that Mother acted knowingly. In the nine months prior to the hospitalization that is the genesis of this

- 10 -

appeal, A.B. twice was hospitalized due to Mother administering incorrect doses of medication. Moreover, the hospital staff reviewed the proper dosages with Mother as recent as six months before the instant occurrence, yet Mother neglected to attend the follow-up review during September 2018. Mother never voiced any concerns with, or confusion about, A.B.'s medication. Notwithstanding this training and knowledge, it was apparent to the medical staff that Mother had not administered the appropriate doses of medications to A.B. prior to her February 2019 admission. In fact, Mother admitted to the hospital staff that she had discontinued one medication and gave her daughter less than the prescribed amount of another. The foregoing facts sustain the juvenile court's finding that Mother acted knowingly pursuant to §302(b)(2), *i.e.*, that it was practically certain that Mother's conduct in providing A.B. less then than the prescribed amount of medication would cause the expected result.

Furthermore, we reject Mother's contention that the finding of abuse is erroneous because neither Dr. Suarez nor Dr. Naji opined "within a reasonable degree of medical certainty that [M]other's conduct rose to the level of intentional, knowing, or reckless child abuse." **See** Mother's Brief at 20-21. Stated plainly, a formal diagnosis of child abuse is not required. **See In re T.G.**, 497 ("Regardless of whether [the doctor] made a medical diagnosis of child abuse in these circumstances, it [would be] error for the trial court to ignore Mother's responsibility for [the child's] actual physical state and conclude that Mother's obvious medical neglect was not serious physical

- 11 -

neglect that is tantamount to child abuse pursuant to 23 Pa.C.S. § 6303(b.1)(7) of the CPSL.").

Likewise, we find unconvincing Mother's assertion that the juvenile court's finding of abuse was improper because A.B. was discharged to Mother's care. *See* Mother's Brief at 17. The argument insinuates that the agency would under no circumstances return a child to the care of perpetrator of abuse. However, as noted *supra*, DHS acquiesced to the discharge only after fashioning a safety plan that enlisted the supervision of maternal grandmother and aunt, initiating in-home services, and providing access to a home nurse. The agency's flexibility was consistent with its mandate to preserve the unity of the family whenever possible. In this light, it is obvious that A.B.'s return home is not determinative of whether Mother committed abuse by knowingly deviating from the child's medication regimen. This argument fails.

As the certified record supports the finding of abuse pursuant to 23 Pa.C.S. § 6303(b.1), we do not disturb it.[4] Accordingly, we affirm the juvenile court order of disposition finding that mother perpetrated child abuse.

---

[4] We reject the guardian *ad litem*'s argument that the finding of child abuse in this case serves no purpose. As our High Court recently stated in ***Interest of D.R.***, __ A.3d __, 2020 WL 3240581, at *4 (Pa. June 16, 2020), "The CPSL's stated purpose is to facilitate reporting, investigation, and mitigation of child abuse and neglect." ***See also*** 23 Pa.C.S. § 6302. Hence, the CPSL was enacted to protect vulnerable children from abuse and neglect, including children who are entirely dependent upon caregivers for medical care, and to mitigate future abuse and neglect. To the extent that the instant finding of abuse restricts Mother's ability to work in a field where she would be responsible for providing similar care to vulnerable children, it serves that aspect of the statute.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/07/2020