J-A10044-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2265 EDA 2020 |

Appeal from the Order Entered November 10, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002247-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.E., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2266 EDA 2020 |

Appeal from the Order Entered November 10, 2020
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0002248-2018

BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED:  JUNE 4, 2021**

In this consolidated appeal, A.B. (Mother) appeals from the order entered on November 10, 2020, in the Court of Common Pleas of Philadelphia County, finding the existence of aggravated circumstances and directing that reunification efforts no longer be made for Mother and her son, T.B., born in

---

[*] Retired Senior Judge assigned to the Superior Court.

May of 2015. In addition, Mother appeals from the order of adjudication and disposition entered on November 10, 2020, with respect to her younger son, Z.E., born in June of 2017. The order discharged the petition for dependency, reunified Z.E. with his biological father, Z.E., Sr., and found Mother to be the perpetrator of child abuse against Z.E.[1] After careful review, we affirm both orders.

The relevant facts and procedural history are as follows. By order entered on December 12, 2018, the trial court found that T.B., the older child, then three years old, was the victim of child abuse perpetrated by Mother.[2] On January 10, 2019, the court adjudicated T.B. dependent and placed him in the legal and physical custody of the Philadelphia Department of Human Services (DHS). T.B.'s placement goal was reunification. On appeal, this Court affirmed the child abuse order. *In re T.B.*, 220 A.3d 666 (Pa. Super. 2019) (unpublished memorandum).

On October 3, 2018, due to the then-pending allegation of T.B.'s child abuse perpetrated by Mother, the court placed sixteen-month-old Z.E. in emergency protective custody. On October 4, 2018, the Honorable Joseph Fernandes placed Z.E. in shelter care. On January 10, 2019, following a

_____

[1] Neither T.B.'s natural father, B.B., nor Z.E.'s natural father, Z.E., Sr., filed notices of appeal, and they are not parties to this appeal.

[2] Unless otherwise indicated, the Honorable Deborah L. Canty presided over T.B.'s and A.E.'s underlying dependency cases, and she presided over the subject proceedings.

hearing on the dependency petition filed by DHS, the trial court discharged the petition and transferred legal and physical custody of Z.E. to his natural father, Z.E., Sr. (Father). Further, on that same date, the court issued a custody decree awarding Father physical and legal custody of Z.E.

Mother subsequently initiated custody proceedings in the domestic relations division with respect to Z.E. N.T., 8/10/20, at 57, 73. As best we can discern, by order dated May 24, 2019, the domestic relations court awarded Mother and Father shared physical custody on an alternating weekly basis with transfers occurring on Sunday evenings at 6:15 p.m. *Id.* at 73.

On July 11, 2019, DHS received a report alleging that Mother took Z.E., then twenty-five months old, to the emergency room at Saint Christopher's Hospital in Philadelphia for unexplained vomiting and facial bruising. N.T., 8/10/20, at 53, 55. In a supplemental report dated July 11, 2019, DHS received allegations that Z.E. had a lacerated pancreas and fractured ribs. *Id.* at 55.

On July 16, 2019, upon discharge from Saint Christopher's Hospital, the trial court placed Z.E in the protective custody of DHS. On July 17, 2019, following a hearing, the court placed Z.E. in shelter care. DHS filed a dependency petition on July 24, 2019, where it alleged that Z.E. was a victim of child abuse perpetrated by Mother. On August 6, 2019, after investigation, DHS indicated the reports against Mother. N.T., 8/10/20, at 56. Further, DHS listed the case as a near-fatality due to Z.E.'s lacerated pancreas. *Id.* at 64.

Thereafter, by multiple orders, the trial court continued Z.E.'s adjudicatory hearing and deferred a finding in that regard. In the *interim*, the court temporarily placed Z.E. with his paternal aunt. By order dated January 15, 2020, the court subsequently granted Father temporary physical and legal custody of Z.E.

On August 10, 2020, the evidentiary hearing occurred with respect to the dependency petition for Z.E. and, in T.B.'s dependency case, a permanency review and request for aggravated circumstances.[3] Father and Mother were represented by counsel,[4] and T.B. and Z.E. were represented by a Child Advocate.

DHS presented the testimony of Marita Lind, M.D., an expert in pediatric child abuse; Latia Kirby, case manager at the Community Umbrella Agency (CUA); Jessica Merson, DHS social services program supervisor who investigated the allegations of child abuse and marked the case as a near-fatality due to Z.E.'s lacerated pancreas; Father; N.V., Z.E.'s paternal grandmother; and C.P., Z.E.'s paternal great-grandmother. Mother testified on her own behalf.

---

[3] The Child Advocate filed a motion for aggravated circumstances on October 24, 2019.

[4] T.B.'s natural father, B.B., was also represented by counsel during the hearing, but he did not attend.

Jessica Merson testified that Mother took Z.E. to the emergency room at Saint Christopher's Hospital on the evening of July 10, 2019, when Z.E. had been in her physical custody for approximately twenty-four hours. N.T., 8/10/20, at 61; *see also id.* at 57, 67 (Ms. Merson testified that Mother commenced her custodial period on July 9, 2019, following Father's approximately ten consecutive days of physical custody.).

Z.E.'s paternal grandmother, N.V., a dialysis nurse, testified that Father and Z.E. live with her. N.T., 8/10/20, at 84. She testified that, after Father leaves for work, she takes care of Z.E. until she leaves for work, at which time her mother, Z.E.'s paternal great-grandmother, C.P., takes care of him, and she resides at a different residence. *Id.* N.V. testified that she left her home with Z.E. at 3:30 p.m. on July 9, 2019, and took him to McDonald's before arriving at C.P.'s house. *Id.* at 85-86. N.V. remained at C.P.'s house with Z.E. until approximately 6:00 p.m. *Id.* at 86. She testified that Z.E. ate the chicken nuggets from McDonald's; he was not in pain; and he did not have any bruises. *Id.* at 86, 90. C.P. confirmed that Z.E. ate while in her home; showed no signs of vomiting; and showed no signs that he was in pain. *Id.* at 93. C.P. testified that she was alone with Z.E. in her home for less than one hour after N.V. left on July 9, 2019, until Mother picked him up. *Id.* at 92.

Dr. Lind, who examined Z.E. at Saint Christopher's Hospital on July 11, 2019, testified that Z.E. had bruising on "the right angle of his jaw and [his]

right ear"; "abrasions to the top and bottom lip"; and bruising around his left eye. N.T., 8/10/20, at 16-17.

Dr. Lind testified that an abdominal CAT scan revealed a contusion and a laceration of Z.E.'s pancreas. *Id.* at 17. She stated that the testing was inconclusive on "whether it was a complete transection of the pancreas. . . ." *Id.* She explained on cross-examination by Mother's counsel:

Q. And you spoke about there was a contusion, laceration. You were unable to determine whether there was a complete transection.

Can you describe the difference between those?

A. So when they did the CAT scan, the CAT scan findings indicate that there was a contusion with a lucid line through it in the pancreas, which was a fracture or a laceration of the pancreas. They were unable to see if it completely broke the pancreas in half or if it was a partial break of the pancreas. So that's what the complete transection would mean, if the parts of the pancreas had been separated from each other. And the CAT scan views were unable to determine that.

*Id.* at 30. She stated, "Injury to the pancreas is very serious and can lead to complications that are life-threatening." *Id.* Dr. Lind explained, "[T]he pancreas has enzymes that help . . . break down fats. So if there is damage to the pancreas and leakage of those enzymes, they can damage the surrounding organs." *Id.* In this case, Dr. Lind testified that laboratory testing revealed Z.E. had an "elevated liver function test and also an elevated lipase, which is an enzyme made by the pancreas." *Id.*

Finally, Dr. Lind testified that Z.E. had a fracture in the anterior of his seventh rib, but she did not specify on which side of his body. *Id.* at 18. She

testified that the fracture was in the early stage of healing. *Id.* at 25. In addition, Dr. Lind testified that Z.E.'s sixth rib, on the same side of his body, may have been fractured, and she did not recall whether that fracture was subsequently confirmed. *Id.* at 18, 25-26.

On November 10, 2020, the trial court reconvened the hearing for closing arguments. The trial court set forth extensive factual findings on the record in open court and concluded that Z.E. was the victim of child abuse pursuant to 23 Pa.C.S. § 6303(b.1), and that Mother was the perpetrator pursuant to 23 Pa.C.S. § 6381(d). N.T., 11/10/20, at 19-38.

On that same date, Latia Kirby, the CUA case manager, testified that Z.E. is safe in his placement with Father, and that Father is meeting his needs. N.T., 11/10/20, at 38-39. As a result, the court discharged the dependency petition with respect to Z.E. and confirmed "full physical and legal custody in [F]ather. . ." on the record. *Id.* at 40.

Finally, the parties' counsel offered closing arguments in T.B.'s dependency case with respect to the request for aggravated circumstances as to Mother. The trial court set forth its factual findings on the record and concluded that aggravated circumstances exist pursuant to 42 Pa.C.S. § 6302. N.T., 11/10/20, at 62-66. Further, the court concluded, "DHS no longer needs to make reasonable efforts to reunify T.B. with [M]other." *Id.* at 66.

By order of adjudication and disposition dated and entered at Z.E.'s docket number on November 10, 2020, the court found Z.E. not dependent;

discharged the dependency petition; returned Z.E. to the physical and legal custody of Father; and found that Z.E. suffered child abuse that was perpetrated by Mother. By order dated and entered at T.B.'s docket number on November 10, 2020, the court found that aggravated circumstances exist as to Mother and directed that DHS no longer make reasonable efforts to reunify her with T.B.

On December 4, 2020, Mother filed notices of appeal at the separate docket numbers, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). This Court consolidated the appeals *sua sponte*. On January 11, 2021, the trial court filed an opinion pursuant to Rule 1925(a), which it filed at both docket numbers.[5]

On appeal, Mother presents the following issues for our review:

1. Did the trial court err as a matter of law and abuse its discretion by entering a finding of child abuse against Mother pursuant to 23 Pa.C.S. § 6303(b.1) when insufficient evidence was introduced to demonstrate that Mother intentionally, knowingly, or recklessly caused bodily injury to Z.E. through a recent act or failure to act?

2. Did the trial court err as a matter of law and abuse its discretion by finding that Mother failed to rebut the *prima facie* presumption of responsibility for Z.E.'s injury pursuant to 23 Pa.C.S. § 6381(d), thus finding that Mother is a perpetrator of child abuse?

3. Did the trial court err as a matter of law and abuse its discretion by awarding sole physical and legal custody of Z.E. to Father in the absence of clear and convincing evidence that

---

[5] The Child Advocate filed a participant's brief in support of the orders on appeal.

Z.E. would be without proper parental care and control in Mother's custody?

4. Did the trial court err as a matter of law and abuse its discretion by finding that Z.E. was not a dependent child, as Father was ready, willing, and able to provide proper parental care and control pursuant to *In re Justin S.*, 543 A.2d 1192 (Pa. Super. 1988)?

5. Did the trial court err as a matter of law and abuse its discretion by a finding of aggravated circumstances in the absence of clear and convincing evidence that T.B.'s sibling was the victim of physical abuse perpetrated by Mother that resulted in "serious bodily injury" as defined by 42 Pa.C.S. § 6302?

6. Did the trial court abuse its discretion by relieving [DHS] of the obligation to provide Mother with reasonable efforts to facilitate reunification with T.B.?

Mother's brief at 4.

We review this appeal for an abuse of discretion. *In the Interest of L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015). The standard of review in dependency cases "requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." *Id.* (citation omitted).

Section 6303 of the Child Protective Services Law (CPSL) defines "child abuse" as follows, in relevant part.

**§ 6303. Definitions.**

. . .

**(b.1)** *Child abuse.* — The term "child abuse" shall mean intentionally, knowingly or recklessly doing any of the following:

- 9 -

**(1)** Causing bodily injury to a child through any recent act or failure to act.

. . .

23 Pa.C.S. § 6303(b.1)(1). Section 6303(a) defines "intentionally," "knowingly," and "recklessly" as "hav[ing] the same meaning as provided in 18 Pa.C.S. § 302 (relating to general requirements of culpability)." 23 Pa.C.S. § 6303(a).[6] Section 6303(a) defines "bodily injury" as "Impairment of physical condition or substantial pain." *Id.*

_____

[6] 18 Pa.C.S. § 302 provides:

(1) A person acts intentionally with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and

(ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.

(2) A person acts knowingly with respect to a material element of an offense when:

(i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

(ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

*(Footnote Continued Next Page)*

In **L.Z.**, our Supreme Court stated, "While a petitioning party must demonstrate the existence of child abuse by the clear and convincing evidence standard applicable to most dependency determinations, . . ., the identity of the abuser need only be established through *prima facie* evidence in certain situations. **L.Z.**, 111 A.3d at 1174. *Prima facie* evidence is "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted, will remain sufficient." **Id.** at 1184 (citing Black's Law Dictionary 825 (6th ed. abridged 1991)). Section 6381(d) of the CPSL provides:

> **§ 6381. Evidence in court proceedings.**
>
> . . .
>
> **(d)** *Prima facie evidence of abuse.* — Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

---

> (3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S. § 302(b).

. . .

23 Pa.C.S. § 6381(d).  The **L.Z.** Court held:

> [E]vidence that a child suffered injury that would not ordinarily be sustained but for the acts or omissions of the parent or responsible person is sufficient to establish that the parent or responsible person perpetrated that abuse unless the parent or responsible person rebuts the presumption.  The parent or responsible person may present evidence demonstrating that they did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive.  The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by the CYS agency and the rebuttal of the parent or responsible person.

**In re L.Z.**, 111 A.3d at 1185 (footnote omitted).  The Court emphasized, "when a child is in the care of multiple parents or other persons responsible for care, those individuals are accountable for the care and protection of the child whether they actually inflicted the injury or failed in their duty to protect the child."  **Id.**

In her first issue on appeal, Mother asserts that DHS failed to prove by clear and convincing evidence that she "intentionally, knowingly, or recklessly" caused Z.E.'s injuries.[7]  We disagree.

---

[7] To the extent that Mother contends the trial court abused its discretion by failing to make any finding regarding Mother's intent under Section 6303(c), we conclude that she has waived this argument for failing to raise it in both her concise statement and the statement of questions involved portion of her brief. **See Krebs v. United Refining Company of Pennsylvania**, 893 A.2d 776, 797 (Pa. Super. 2006) (holding an appellant waives issues that are not
*(Footnote Continued Next Page)*

To declare a child a victim of child abuse, this Court has stated, "The evidence must show by clear and convincing evidence that the child[] w[as] abused and that the injuries were not accidental." **In re Read**, 693 A.2d 607, 611 (Pa. Super. 1997). "Clear and convincing evidence" requires:

> that the witnesses must be found to be credible; that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order; and that their testimony is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. It is not necessary that the evidence be uncontradicted provided it carries a clear conviction to the mind or carries a clear conviction of its truth.

**In re J.M.**, 166 A.3d 408, 423 (Pa. Super. 2017) (citation omitted).

Instantly, the trial court recounted on the record the injuries sustained by Z.E. as testified to by Dr. Lind. N.T., 11/10/20, at 20-21. The court also recounted Mother's testimony and determined that she was not credible. **Id.** at 30-34. We summarize Mother's testimony as follows.

Mother went to work on the morning of July 10, 2019, and left Z.E. in the care of her paramour, S.D., from approximately 8:00 a.m. to 5:00 p.m. N.T., 8/10/20, at 102, 108. Mother testified that her paramour informed her,

---

raised in both the appellant's concise statement of errors complained of on appeal and the statement of questions involved portion of the appellant's brief on appeal); **see also** 23 Pa.C.S. § 6303(c) (Restatement of culpability) (providing, "Conduct that causes injury or harm to a child . . . shall not be considered child abuse if there is no evidence that the person acted intentionally, knowingly or recklessly when causing the injury or harm to the child. . . .").

approximately around lunchtime, that Z.E. "fell off of his bike." *Id.* at 103, 108-109. Z.E.'s bike was later described as a tricycle. Mother testified that Z.E. did not know how to pedal the tricycle. *Id.* at 103. She explained that he would sit on the tricycle, and "use his feet and try to push himself." *Id.* Mother also stated that sometimes she would push Z.E. around on the tricycle inside her home. *Id.* Mother testified that Z.E. "fell off the bike before." *Id.* at 104. When Mother returned home from work on July 10, 2019, at approximately 5:00 p.m., she observed that Z.E.'s "eye was red. It was a big red mark. It wasn't a bruise yet. His lip, of course, it was red. He had like little scratches. He looked like he fell off the bike. It was not a bruise yet." *Id.* at 112. Mother acknowledged that Z.E. appeared "to be in pain on his face" when she returned home from work. *Id.* at 109.

Mother confirmed on cross-examination by the Child Advocate that she did not see bruising on Z.E.'s face when she picked him up from his great-grandmother's house on the evening of July 9, 2019, and she did not see any bruising before she left for work on the morning of July 10th. *Id.* at 111. Mother testified that Z.E.'s facial bruises were a result of him falling off the tricycle, but she had no explanation for his pancreatic injury or his rib fracture. *Id.* at 106-107.

The court found credible Jessica Merson, the DHS program supervisor who investigated the child abuse allegations. Ms. Merson testified:

> Q. Did you ask [Mother] if there were any other caretakers of [Z.E.] during [her] custodial time?

A. Yes.

Q. And what did she report?

. . .

A. [A]t first she stated that her paramour . . . was there[,] and that she was at work. And then throughout the course of our speaking, she . . . stated that she wasn't at work[,] and that she had been there.

And then later I did speak to [her paramour] himself. He stated that [Mother] was the only one home at the time caring for [Z.E.] when he was injured.

N.T., 8/10/20, at 61-62. Ms. Merson stated that Mother's "story changed multiple times throughout my conversation with her." *Id.* at 62.

The trial court found credible Dr. Lind's testimony regarding causation of Z.E.'s injuries, as follows.

Dr. Lind also testified that [M]other reported that the child appeared fussy the evening before when she got him back in her care, and that the following day, he ate normally and played and rode his tricycle.

Dr. Lind also testified that [M]other said she believed that the bruising on [Z.E.]'s face was related to him falling off his tricycle. Dr. Lind indicated that [Z.E.] was two [years old] and would not be expected to effectively pedal his tricycle.

And, even if he could get the pedals to move around, it would be unexpected that he could generate the true velocity or force required to bruise his face. She also indicated that it would be unexpected in the child's normal experience to have injuries . . . "on different planes" [of his face].

Dr. Lind indicated that a tricycle accident would not explain the broken ribs because it would take some force and velocity to create enough energy to cause a significant injury, and there was no report that an adult was propelling [Z.E.] on the tricycle.

- 15 -

Dr. Lind also opined that [M]other's explanation of the tricycle fall would not be sufficient to explain the pancreatic injury because [Z.E.] would not be expected to be able to generate enough energy to cause the internal injuries.

Dr. Lind also opined that **[Z.E.]'s injuries are not common childhood injuries, that [Z.E.] could have caused . . . the bruising to his eye, depending on how he fell, but he would not have been able to cause the other injuries [on his face] to himself, given that they were on the other side of his face.**

Dr. Lind also testified that the injuries [Z.E.] sustained would be painful and that, in fact, [Z.E.] appeared to be in pain. Dr. Lind further testified that it would not be expected that [Z.E.] could eat well or behave normally after he had such a severe internal injury as the injury to his pancreas. That was from Page 22 of the notes of testimony.

**Dr. Lind further opined that the combination of [Z.E.]'s injuries, the bruising to his face on multiple locations, the rib fracture and the pancreatic traumatic injury are best explained by a traumatic event, and a fall on a tricycle would not be sufficient to explain the injuries, and that there was a lack of history of trauma to the child so that it was concerning for physical abuse.**

Dr. Lind also opined that the injury to the pancreas could result from a blow to the front of the abdomen. . . . [T]he signs that would alert a caregiver to abdominal injury or pain [are] discomfort, decreased eating, vomiting and decreased activity.

N.T., 11/10/20, at 21-24 (emphasis added). Dr. Lind's testimony supports the court's findings. N.T., 8/10/20, at 19-23, 28-29. We particularly emphasize Dr. Lind's testimony on direct examination:

Q. Based on your evaluation and expertise, are you able to say within a reasonable degree of medical certainty that [Z.E.]'s injuries are concerning for physical child abuse?

A. Yes.

Q. And why do you hold that opinion?

A. So the constellation of the child's injuries — the bruising to the face on multiple locations, the rib fractures, and the pancreatic traumatic injury — are best explained through a significant traumatic event. There was no significant traumatic event history provided by either parent. The history of the injury on his toddler tricycle inside a home is not sufficient to explain these injuries. And, therefore, from the context of diagnose[d] traumatic injuries and no history of trauma, the concern for child physical abuse is the most reasonable diagnosis.

*Id.* at 22-23.

Based on Dr. Lind's opinion that Z.E.'s injuries were caused by child abuse, we discern no abuse of discretion by the trial court in concluding that DHS satisfied its burden of proof under Section 6303(b.1)(1). Therefore, Mother's first issue fails.

In her second issue, Mother argues that the trial court abused its discretion in concluding that she failed to rebut the *prima facie* presumption pursuant to Section 6381(d) with respect to Z.E.'s injuries to his pancreas and rib. Mother argues that those injuries occurred before Z.E. returned to her home on the evening of July 9, 2019. We disagree.

With respect to the pancreatic injury, Mother relies on Dr. Lind's testimony that, "with abdominal injuries pain would increase over time and vomiting can be delayed in presentation. N.T., 8/10/20, at 29." Mother's brief at 21. Mother asserts that Z.E. "did not eat well or behave normally from the time he returned to [her] care, and, consistent with Dr. Lind's testimony, his symptoms increased in severity over time until Mother brought him to the

hospital the following evening. N.T., 8/10/20, at 99-102." *Id.* Mother specifically testified that Z.E. "wouldn't eat" at her house on the evening of July 9, 2019, but he played with the tricycle. N.T., 8/10/20, at 99-100.

With respect to Z.E.'s rib fracture, Mother contends that (1) Dr. Lind testified that it was in the early stage of healing; (2) Z.E. had been in her custody for only twenty-four hours when she took him to the emergency room; and (3) Z.E. had spent approximately ten days prior to that in Father's custody. Thus, Mother asserts that she could not have been the perpetrator of the rib fracture.

Dr. Lind testified on cross-examination by Mother's counsel:

Q. [A]bout how quickly after such [a pancreatic] injury do these type of symptoms start to manifest?

A. So with abdominal injuries, generally, **children will not eat well after the time or eat normally after the time they're injured. Sometimes vomiting will be somewhat delayed, and the pain generally increases as those enzymes leak out**. . . .

N.T., 8/10/20, at 29 (emphasis added). Dr. Lind testified on direct examination that Mother reported to her in the hospital "that the child had been fussing starting the evening that she had the child back in her care; **that during the following day, he ate normally[8] and played[,] and[,] at one point was riding his toy tricycle inside the home**. . . ." N.T.,

---

8 Contrary to what Mother told Dr. Lind, Mother testified during the subject proceeding that Z.E. ate breakfast on the morning of July 10, 2019, but that he "threw it all up." N.T., 8/10/20, at 102.

8/10/20, at 18-19 (emphasis added). Dr. Lind testified that, although she was unable "to exactly date the pancreatic injury looking simply at the CAT scan, . . . it would not be expected that [Z.E.] would've been eating well or behaving normally after he had such a severe internal injury." *Id.* at 22.

The trial court found Dr. Lind credible in determining that Mother was the perpetrator of Z.E.'s pancreatic injury, as follows.

> Dr. Lind was very clear that, having sustained a pancreatic injury within a relatively short period of time, [Z.E.] would have started to exhibit some symptoms, and **she found it very inconsistent that [Z.E.] would've been able to ride his tricycle the day after if he had sustained an injury to his pancreas the day before**.

N.T., 11/10/20, at 33 (emphasis added). The court continued:

> Mom's testimony was that, on July 10, the day after she picked [Z.E.] up from [F]ather, he was still able to ride a bike, he was still walking around, which is inconsistent with Dr. Lind's testimony that he would not of been able to do that.
>
> Mom did try to provide testimony that [Z.E.] was throwing up and unable to keep anything down, but that is also inconsistent with the testimony mom tried to provide to say that [Z.E.] was riding the bike.
>
> It doesn't make sense to me that you would allow a child to ride a bike if [he is] throwing up and unable to keep anything down.

*Id.* at 33-34.

The trial court found that Mother's "story is inconsistent between what she told DHS [and] what she testified to in court[,] and[,] as such, I don't find [Mother] credible." N.T., 11/10/20, at 33; *see also* N.T., 8/10/20, at 61-62

(Ms. Merson testified that Mother changed her story "multiple times" regarding Z.E.'s caretakers during her custodial time.").

The court found the following testimony by Ms. Merson credible:

Q. Why did you indicate [M]other as a perpetrator of child abuse?

A. Based on the timeline that was provided by [M]other as well as the other parties that I interviewed[9] as well as the photograph [provided by Father],[10] and speaking with Dr. Lind.

[Z.E.] has sustained the bruising after leaving [F]ather's home based on the time[-]stamped photos. And even according to the timeframe, **[Z.E.] began vomiting and stopped eating once [he was] with [M]other**.
. . .

*Id.* at 63 (emphasis added); *see also id.* at 102 (Mother testified that Z.E. ate his breakfast on the morning of July 10, 2019, but "he threw it all up.").

With respect to Father, Ms. Merson testified that she ruled him out as the perpetrator of the child abuse "through my interviews of getting the timeline as to when [Z.E.] started exhibiting signs of being in pain and being ill," which Mother told her was on July 10, 2019. *Id.* at 64.

The trial court concluded:

I do not believe that [Mother] has rebutted the testimony and provided proof that I find compelling. Again, I don't find [Mother] credible. Nothing in [Mother]'s story makes sense. She doesn't

---

[9] Ms. Merson also interviewed Father and Z.E.'s paternal grandmother. N.T., 8/10/20, at 63. Ms. Merson did not specify whether she interviewed Z.E.'s paternal great-grandmother.

[10] Ms. Merson testified that Father provided time-stamped photographs of Z.E. from July 9, 2019, before the child was transferred to Mother's custody, which showed no facial bruising. N.T., 8/10/20, at 59, 68-69.

> remember telling DHS that she was the only one caring for him, but then she testified that she went to work and her paramour cared for him.
>
> DHS's testimony was clear that the paramour indicated [he] did not care for him, and [Mother] herself told DHS initially that she was the only one caring for him.
>
> . . .
>
> Dr. Lind . . . could say that the pancreatic laceration was relatively recent.
>
> And, so, . . . what seems clear to me is that [Z.E.] sustained the pancreatic laceration after getting to [Mother]'s home.
>
> He was able to eat, as testified by three different people on July 9. The only testimony that we have that he couldn't eat on July 9 was from [Mother], who again I have not found credible.
>
> And the fact that he wasn't [eating] on July 9 isn't necessarily conclusive because paternal grandmother and paternal great-grandmother both testified that [Z.E.] ate and finished up his meal at paternal great-grandmother's house, which was sometime between 3:30 . . . and 7 p.m.
>
> So, it's not conclusive in and of itself that he did not eat. What is significant is that no one testified that [Z.E.] started throwing up the night of July 9.

N.T., 11/10/20, at 34-35. Based on the foregoing, we discern no abuse of discretion by the court in concluding that DHS established through *prima facie* evidence that Mother was the perpetrator of Z.E.'s pancreatic injury, and that she failed to rebut that presumption.

With respect to the rib injury, the trial court found:

> [Z.E.] had been going back and forth between both homes since May. And, so, I can't say with any certainty that [F]ather [perpetrated the rib fracture].

But, in light of the fact of me believing that [Mother] or someone in her home because the pancreatic injury, I believe . . . that same individual because the rib fractures, albeit not discovered until there was a workup being done for the injuries Z.E. sustained on July 10.

N.T., 11/10/20, at 36. The court's findings are supported by Dr. Lind's testimony on cross-examination, as follows.

Q. The report identifies [the rib fracture] as being likely early subacute.

What does subacute mean?

A. [S]ubacute means that we are beginning to see some healing, early healing.

. . .

Q. And is it possible from the signs of healing and the early subacute characterization of the fracture to determine about when this injury would have happened?

A. I wasn't able to determine that because in addition to some early callus formation, there was also, what they call, discontinuity of the cortex. So they could still see the break. So I really was not able to narrow down that time frame. . . . **The subacute time frame can extend out for days.**

N.T., 8/10/20, at 25-26 (emphasis added). Because the subacute healing phase "can extend out for days," we discern no abuse of discretion by the trial court in concluding that Z.E.'s rib fracture did not occur while he was in Father's custody. Therefore, we will not disturb the court's finding that DHS established through *prima facie* evidence that Mother was the perpetrator of Z.E.'s rib fracture, and that she failed to rebut that presumption. Mother's second issue fails.

Mother's third and fourth issues are interrelated. The crux of her argument is that the court erred and/or abused its discretion by awarding Father sole legal and physical custody of Z.E. Mother asserts that, because the trial court's finding that she perpetrated child abuse against Z.E. is not supported by sufficient evidence, the court abused its discretion by finding DHS's dependency allegations satisfied as to her. Therefore, she asserts, "the question of whether Father was immediately available to provide such care was not properly before the trial court." Mother's brief at 28. Even if the question was properly before the trial court, Mother argues the court abused its discretion by finding that "Father was 'ready, willing, and able' to provide proper care for Z.E. . . ." *Id.* Specifically, she argues that Father perpetrated Z.E.'s pancreatic and rib injuries. Mother's third and fourth issues are without merit.

Dependency matters are governed by the Juvenile Act, 42 Pa.C.S. § 6301, *et seq*.

> A "dependent child" is defined, in relevant part, as one who is without proper parental care or control, subsistence, education as required by law or other care or control necessary for his physical, mental or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian that places the health, safety or welfare of the child at risk[.] The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available.

The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency.

*In re G., T. (Appeal of S.S.)*, 845 A.2d 870, 872 (Pa. Super. 2004) (internal citations and quotation marks omitted); *see also* 42 Pa.C.S. § 6302 (definition of dependent child).  Moreover, "a child, whose non-custodial parent is ready, willing and able to provide adequate care to the child, cannot be found dependent. . . ." *In re M.L.*, 757 A.2d 840, 850-851 (Pa. 2000).

It is well-established that,

When abuse is alleged as a part of a dependency proceeding, a court's finding of 'abuse' as defined by the CPSL would be sufficient evidence under most circumstances to support an adjudication of dependency.  However, a court cannot adjudge a child to be dependent when his non-custodial parent is ready, willing, and able to provide the child with proper parental care and control, especially when the lower court finds that the child was abused while under the custodial parent's care and control.

*In the Interest of Justin S.*, 543 A.2d 1192, 1199 (Pa. Super. 1988).

This Court recently explained:

[I]t is generally improper to dispose of the custody of a child in a dependency proceeding where there has been no adjudication of dependency.  *See* [*In the Interest of Justin S.*, 543 A.2d 1192, 1197 (Pa. Super. 1988)].  However, the Court held that no such adjudication of dependency can take place where there is a non-custodial parent who is ready, willing and able to provide proper parental care and control.  *See id.* at 1199.

The Court therefore held that, in a dependency proceeding, a court may grant custody of an allegedly dependent child to that child's non-custodial parent without first declaring the child dependent *as long as sufficient evidence of dependency exists*.  *See id.* (emphasis added).  In other words, if a dependency petition is filed against the custodial parent and there is sufficient evidence for the court to adjudge the child dependent but for the

intervention of the non-custodial parent who is willing and capable of caring for the child, the trial court may properly grant custody to the non-custodial parent in a dependency proceeding.

*In the Interest of J.B.*, 247 A.3d 447, 452-453 (Pa. Super. 2021).

Here, we have rejected Mother's arguments that the evidence supports neither child abuse pursuant to Section 6303(b.1) nor Mother as the perpetrator pursuant to Section 6381(d). It follows that sufficient evidence of dependency existed for the court to adjudge Z.E. dependent as to Mother. *In the Interest of Justin S.*, 543 A.2d at 1199. Further, the evidence supports the court's finding that Father was ready, willing, and able to provide Z.E. with proper parental care and control.

Latia Kirby, the CUA caseworker, testified that the court temporarily awarded Father sole custody on January 15, 2020, and there have been no concerns with Z.E. since then. N.T., 8/10/20, at 96. Ms. Kirby testified that Z.E. is developmentally on target. *Id.* at 96. Ms. Kirby assessed Z.E.'s safety on August 7, 2020, and determined that he was safe, and his needs were being met. *Id.* at 96-97. Ms. Kirby testified that court supervision of Z.E. in Father's home is unnecessary. *Id.* at 97.

To the extent Mother argues that Father perpetrated the injuries to Z.E.'s pancreas and rib, we reject her argument. We discern no abuse of discretion by the court in light of its credibility determinations in favor of Dr. Lind, Ms. Merson, Father, and Z.E.'s paternal grandmother and great-grandmother and against Mother in concluding that Mother, not Father, was

the perpetrator of all of the injuries pursuant to Section 6381(d). *See* N.T., 11/10/20, at 33-34, 37 (the trial court's credibility findings). As such, Mother's third and fourth issues are without merit.

In her fifth issue, Mother asserts that the court abused its discretion in finding that aggravated circumstances exist as to Mother in T.B.'s dependency case. Specifically, Mother asserts that Z.E.'s injuries do not constitute "serious bodily injury." We disagree.

Section 6341(c.1) of the Juvenile Act provides:

> **(c.1) Aggravated circumstances.--**If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to . . . to preserve and reunify the family shall be made or continue to be made. . . .

42 Pa.C.S. § 6341(c.1). "Aggravated circumstances" are present, in part, when "[t]he child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by a parent." 42 Pa.C.S. § 6302(2). "Serious bodily injury" is defined as "Bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." 42 Pa.C.S. § 6302.

The trial court found:

> [T]here was impairment in the function of [Z.E.]'s pancreas, which is one of his organs.

Specifically, he had to be hospitalized for about four days, and given medication intravenously, not fed for a couple of days, to help prevent some of the enzymes that were seeping out of the pancreas from going into his body and further damaging other organs in his body.

Dr. Lind testified that that created a substantial risk of other things happening, with death being a potential outcome, not [a] necessarily likely outcome because medical attention was sought[,] and they were able to treat [Z.E.], but it could have ultimately resulted in [death].

And, to be quite clear, the definition for serious bodily injury does not require that there is a substantial risk of death and impairment of the function of an organ; it's "or."

. . .

N.T., 11/10/20, at 65-66. The testimony of Dr. Lind, Father, and Ms. Merson support the court's findings. **See** N.T. 8/10/20, at 31 (Dr. Lind testified that, in the hospital, in order "to allow the pancreas to stop secreting so much of the enzymes because those enzymes are destructive," Z.E. "was given [intravenous] fluids. His food intake was limited."); **see also id.** at 81 (Father testified that Z.E. spent four days in the hospital); **see also id.** at 64 (Ms. Merson testified that the case was marked as a near-fatality "based on the lacerated pancreas."). We discern no abuse of discretion by the court in concluding that Z.E. suffered "serious bodily injury" due to his lacerated pancreas.

Finally, in her sixth issue, Mother argues that the trial court abused its discretion in determining that reasonable efforts to reunify her with T.B. are

no longer necessary. Specifically, Mother asserts that she has fully complied with her single case plan objectives in T.B.'s case. We disagree.

In **L.V.**, this Court stated:

> Pursuant to the Juvenile Act, if a court finds that aggravated circumstances exist in a given case, the court must then "determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home **or to preserve and reunify the family shall be made or continue to be made.** . . ." 42 Pa.C.S. § 6341(c.1). A court may end reasonable efforts at its discretion. **See In re A.H.**, 763 A.2d 873, 878 (Pa. Super. 2000).

**In re L.V.**, 127 A.3d at 839 (emphasis added).

Here, we discern no abuse of discretion by the trial court ending reasonable efforts when T.B. has been adjudicated since January 10, 2019, due to the trial court finding that Mother perpetrated child abuse against him. On November 10, 2020, the court again found Mother the perpetrator of child abuse against Z.E., Mother's younger child. The court's decision to end reunification efforts between Mother and T.B. is reasonable in light of the court finding that she committed child abuse again. Mother's final issue fails.

Accordingly, we affirm the order at docket number 2265 EDA 2020, finding the existence of aggravated circumstances and directing that reunification efforts no longer be made. In addition, we affirm the order at docket number 2266 EDA 2020, discharging the petition for dependency, reunifying Z.E. with Father, and finding Mother to the perpetrator of child abuse.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/4/21</u>