J-S03034-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: H.G.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.A.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1125 WDA 2024 |

Appeal from the Decree Entered September 3, 2024
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s):  2023-00939

BEFORE:  KUNSELMAN, J., SULLIVAN, J., and BECK, J.

MEMORANDUM BY BECK, J.:                    **FILED: MARCH 11, 2025**

A.A.W. ("Father") appeals from the decree entered by the Cambria County Orphans' Court ("orphans' court") granting the petition filed by M.C.B. ("Mother") and L.P. ("Stepfather") to terminate Father's parental rights to H.G.B. ("Child") pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).  Upon review, we affirm.

We glean the following from the certified record.  Mother and Father were never married; they were in a relationship that ended before Child was born in December 2017.  N.T., 8/6/2024, at 68.  Father knew Mother was pregnant, but Mother did not inform Father when Child was born.  *Id.* at 10, 26, 34-35, 68.  In January 2018, Father filed a complaint for custody and the parties reached an agreement.  *Id.*, Father's Ex. 1 (Custody Order).  The December 18, 2018 custody order provided, in relevant part, that Mother and

Father have shared legal custody of Child, with Mother having primary physical custody and Father having supervised partial physical custody. *Id.* Father's periods of supervised partial physical custody were to occur every Saturday from 12:00 to 4:00 p.m. and one additional day every week (which could vary based on Mother's work schedule) for a minimum of four hours. *Id.* The custody order required Mother, or another adult designated by Mother, to supervise the visits. *Id.* The location of the visits was to be agreed upon by the parties; if the visits occurred at Father's residence, Mother was to provide transportation to and from unless otherwise agreed. *Id.* Mother and Father agreed to provide twenty-four hours' notice for canceled visits. *Id.* They agreed all major decisions were to be made jointly and that they each were entitled to copies of reports—including medical, dental, and school reports— relating to Child. *Id.*

On August 21, 2023, Mother and Stepfather[1] filed a petition for involuntary termination of Father's parental rights.[2] The orphans' court

_____

[1] At the time, Mother and Stepfather were engaged; they later married on November 6, 2023. *See* Petition for Involuntary Termination of Parental Rights, 8/21/2023, ¶ 5; N.T., 8/6/2024, at 15, 39, 42. Stepfather has been a part of Child's life and resided with him beginning when Child was less than two years old. N.T., 8/6/2024, at 15, 23, 29, 42, 44.

[2] The petition also indicated that Stepfather would adopt Child following the termination of Father's parental rights, which Mother and Stepfather confirmed at the hearing. *See* Petition for Involuntary Termination of Parental Rights, 8/21/2023, ¶ 8; N.T., 8/6/2024, at 23, 40; *see also In re Adoption of M.R.D.*, 145 A.3d 1117, 1120 (Pa. 2016) (stating that a "petitioning parent *(Footnote Continued Next Page)*

- 2 -

appointed counsel for Child on August 28, 2023.[3] After several continuances for lack of service to Father, Father appeared at the hearing scheduled for July 23, 2024. Father requested, and the orphans' court granted, a continuance to August 6, 2024, because Mother and Stepfather's petition failed to attach a referenced appendix setting forth the grounds alleged for termination. On July 30, 2024, Mother and Stepfather filed an amended petition that included the appendix, alleging that Father had failed to see Child for more than six months prior to the filing of the petition and failed to perform parental duties necessary for Child's care or well-being. On August 2, 2024, Father filed a motion to dismiss the petition, which the orphans' court denied.

On August 6, 2024, the orphans' court held a hearing on the termination petition, at which the parties appeared, along with their counsel and separate counsel for the Child's legal and best interests. The orphans' court heard testimony from Mother, Stepfather, Father, and Father's mother, T.B. ("Paternal Grandmother"). In her testimony Mother admitted that she was not following the custody order. N.T., 8/6/2024, at 12. Mother testified that

---

must demonstrate that an adoption of the child is anticipated in order for the termination petition to be cognizable").

[3] The orphans' court initially appointed one attorney to represent Child's legal and best interests, but when Child told counsel that he would be sad if visits with Father stopped, counsel informed the orphans' court and the court appointed separate legal and best interests counsel on May 20, 2024. N.T., 8/6/2024, at 75-77; **see also** Orphans' Court Order, 5/20/2024; Orphans' Court Scheduling Order, 8/28/2023.

she always waited for Father to contact her to visit Child because she had difficulty reaching him since he changed his phone number frequently. *Id.* at 13, 19, 27, 36. The visits always took place at Paternal Grandmother's residence, which is where Father has lived since Child was born. *Id.* at 14, 30, 32.

Mother testified that Child visited Father on January 2, 2023. *Id.* at 15. After that visit, Mother stated that Father did not see or contact Child, nor did he contact Mother to ask about or request to see Child, for over ten months. *Id.* at 8, 15-17. During this period, Mother and Stepfather testified that they met all Child's needs and Father performed no parental duties on behalf of Child. *Id.* at 18, 42. Mother testified that Child did not ask Mother about Father or mention him during this period. *Id.* at 32-33.

In mid-November 2023, Mother testified that Father reached out to her to visit Child. *Id.* at 20. Since then, she stated that Father visited with Child a "handful" of times; Mother testified that she canceled a "couple times" because of illness. *Id.* at 8-9, 21-22, 24. Mother reported that Child told her that he did not feel comfortable during visits with Father and that he wanted to be with her. *Id.* at 9, 19. Child did not want to sit by Father or interact with him. *Id.* at 19. Mother testified that while supervising the visits, she stayed in the same room as Child for the entire visit and Father did not really interact with Child. *Id.* at 13. She observed Father falling asleep and not paying attention to Child, though she said that Father had taken Child to the

playground.  *Id.* at 9, 19-20.  Child played with other younger children (Father's nieces and nephews) who were at the residence during visits.  *Id.* at 19, 23, 25, 33, 38, 56.

According to Mother, Child had recently started to say he did not want to visit with Father.  *Id.* at 32.  Mother admitted that she did not encourage Child to call Father and left it up to Child to ask for contact with Father.  *Id.* at 10.  She also admitted that she had taken Child to Tennessee without informing Father, though she said she let Paternal Grandmother know.  *Id.* at 10-11.

Mother ensured Child was enrolled in school.  *Id.* at 42.  When Child started kindergarten, Father did not inquire about his school or any school events.  *Id.* at 17, 22.  Mother testified that she used to notify Father of Child's doctors' appointments, but because Father never attended, she stopped informing him.  *Id.* at 11.  Mother stated that she attends to all Child's medical needs and ensures he is covered by health insurance.  *Id.* at 31, 34.

Mother said that Father did not send any cards or letters to Child.  *Id.* at 16-17.  Father never paid child support or supported Child financially other than buying him clothes once when he was a baby.  *Id.* at 28, 61, 67.  Father agreed, though he testified that he gave Child cards and gifts for his birthday in person.  *Id.* at 65.

Before January 2, 2023, Mother testified that the frequency of Father's visits ranged from once every couple of weeks to once every three months.

*Id.* at 18-19. Mother reported that she had taken Child to visit with Father on major holidays such as Christmas and Easter, but Father did not make contact to visit Child during Easter of 2023. *Id.* at 11, 16. She said that Father never asked to have more contact with Child or to take him on a trip. *Id.* at 31-32.

Mother testified, and Father confirmed, there is no bond between Father and Child. *Id.* at 19, 33, 61. On the other hand, Mother and Stepfather both testified that Child is bonded to Stepfather and Stepfather testified that he is attached to Child. *Id.* at 23, 28-29, 40, 43-44. Ever since Child could talk, he has called Stepfather "dad" even though Stepfather corrects him to say that he is his "step-dad." *Id.* at 29, 41, 43. Child calls Father "his father." *Id.* at 29, 43.

Paternal Grandmother testified that Father has lived with her for the past twelve years and confirmed visits with Child took place there. *Id.* at 45-47. She agreed that Child plays with the other children in her home when he visits with Father. *Id.* at 47-48. Paternal Grandmother testified that Child hugs Father and tells Father he loves him at the start and end of visits. *Id.* at 47. According to Paternal Grandmother, Father did not have an opportunity to be active in Child's life "because it was always on [Mother's] terms." *Id.* at 47. Paternal Grandmother testified that from the "very beginning," Mother would not bring Child for visits because of her work schedule or lack of transportation; for a period earlier on, Paternal Grandmother reported that

she transported Mother and Child for visits at her home. *Id.* at 47. She also testified that Father tried to call Mother several times without a response. *Id.* at 51. Paternal Grandmother testified that Father makes food for Child, tries to watch movies and color with him, plays Legos and cars with him, and takes him to the playground. *Id.* at 48-49. Paternal Grandmother blamed Mother's failure to keep Father (and her) informed about Child for Father's lack of involvement with Child at school. *Id.* at 50-51. She also testified that Mother blocked "everybody" on social media, so Paternal Grandmother could only contact her through text messages. *Id.* at 50. Paternal Grandmother testified that Child "does call [Father] father. He doesn't call him dad, and I get it. He doesn't have a dad. [Stepfather], you are his dad." *Id.* at 51. According to Paternal Grandmother, she and Father bought Child clothing, but Mother refused it. *Id.* at 52. Paternal Grandmother admitted that Father has never taken any steps beyond the initial custody complaint to enforce the custody order or to see Child more. *Id.* at 53.

Father is unemployed and does not have a driver's license or vehicle. *Id.* at 30, 52. At the time of the hearing, he did not have his own phone and used Paternal Grandmother's phone to contact Mother. *Id.* at 66. Father testified that he is disabled, receives supplemental security income, and has been diagnosed with an intellectual disability, autism, and several mental health conditions. *Id.* at 67; *see also id.*, Father's Ex. 1. He agreed that he has trouble with his memory because of his diagnoses. *Id.* at 70-71.

Father testified that during visits, he tries to get Child to watch movies or sit and talk to him; he admitted, though, that Child "refuses" and "won't do it," adding that "[i]t is as if [Child] doesn't know me." *Id.* at 56, 62. Father further admitted that Child "runs away" from him and "cries" around him. *Id.* at 61.

Father blamed Mother for not seeing Child more and not keeping him informed about Child's schooling or activities, testifying that his attempts to contact her by phone were not returned for several days or went unanswered. *Id.* at 56-57, 70. Father admitted that he did not know that Child had previously attended preschool, did not know where Child currently attended school, and never asked Child during visits where he went to school. *Id.* at 58, 60, 62. Father further admitted that even though he shared legal custody of Child, he never contacted the school about Child. *Id.* at 60.

Father could not remember the last time he saw Child in person, but he disagreed with Mother's testimony, maintaining that he called her to see Child during the period between January 2, 2023, and November 2023, including holidays, and saw Child about ten times during that period. *Id.* at 58-59, 64-65. He also testified to an unspecified time when Mother canceled a visit with Child because she was attending a wedding. *Id.* at 58, 67.

He stated that he did not attempt to enforce the custody order because he lacked money and did not want to proceed pro se. *Id.* at 60-61, 63, 69. When the orphans' court asked Father why his parental rights should not be

terminated, he responded that he loves Child and that Child is his "whole world." *Id.* at 71.

At the close of the hearing, Father's counsel acknowledged that Father should make "a little more effort" but argued that the orphans' court should not terminate Father's parental rights because he loves Child, he always welcomed Child into his home, and Mother was intentionally trying to distance Child from Father. *Id.* at 72-75. Legal interests counsel for Child argued for termination of Father's parental rights, noting that Child reported to counsel that he did not like seeing Father, Father "sits on the phone" during visits, and Child only liked going to Father's residence to play with other children. *Id.* at 76. Best interests counsel for Child also agreed with termination, noting Father admitted that he did not have a bond with Child, failed to make reasonable efforts to overcome obstacles, including enforcement of the custody order, and failed to make efforts to perform parental duties on Child's behalf. *Id.* at 78-79. Best interests counsel believed termination was in Child's best interests so he could be adopted and have "stability" and "normalcy." *Id.* at 79.

At the close of the hearing, the orphans' court took the matter under advisement. On August 30, 2024, it issued a final decree granting the petition to involuntarily terminate Father's parental rights. This appeal followed.

Father raises the following questions for our review:

A.     Did the [orphans'] court err in finding that [Father] evidenced a settled purpose of relinquishing his parental claim by failing or refusing to perform parental duties?

B.     Did the [orphans'] court fail to consider the Child's best interests and the effect the termination of [Father's] parental rights would have on the Child[?]

Father's Brief at 4.[4]

"In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021).

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re Adoption of B.G.S.*, 245 A.3d 700, 704 (Pa. Super. 2021) (citation omitted).

Termination of parental rights is governed by 23 Pa.C.S. § 2511, which requires a bifurcated analysis. *C.M.*, 255 A.3d at 359. "Initially, the focus is

---

[4] Mother did not file a brief. Counsel for Child's best and legal interests filed separate briefs in support of affirmance of the orphans' court's decree granting the petition to terminate Father's parental rights.

on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a)." *In re C.M.K.*, 203 A.3d 258, 261-62 (Pa. Super. 2019). If the orphans' court determines the petitioner established grounds for termination under section 2511(a) by clear and convincing evidence, the court then must assess the petition under section 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). Clear and convincing evidence is evidence that is so "clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In Int. of J.M.*, 166 A.3d 408, 423 (Pa. Super. 2017) (citation omitted).

Mother and Stepfather sought to terminate Father's parental rights to Child pursuant to section 2511(a)(1). Father argues that Mother and Stepfather failed to meet their burden of proof as his testimony showed that he "always wanted to see his son and did have numerous visits during 2023 and 2024." Father's Brief at 9. He also points to evidence that during visits, he interacted with Child, took him to the playground, encouraged him to play with other children, and hugged him. *Id.* He takes issue with Mother's behavior, noting that she was not following the custody order and did not encourage Child to call Father. *Id.* Father argues that he invited Child to his home as often as Mother would bring him but that "hurdles to a smooth father-

son relationship" exist, including that all visits are supervised by Mother, they are only four hours, Child has some behavioral issues, and Father has mental health challenges. *Id.* at 10.

Section 2511(a)(1) provides that termination is proper if "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1); *see also C.M.*, 255 A.3d at 363-64. "'Parental duties' are not defined in the Adoption Act." *In re Adoption of L.A.K.*, 265 A.3d 580, 592 (Pa. 2021). However,

> our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

*Id.* (citations and quotation marks omitted).

"When considering a request to terminate rights under [s]ection 2511(a)(1), a parent's failure or refusal to perform parental duties must be analyzed in relation to the particular circumstances of the case." *Id.* (citation and quotation marks omitted). "[T]he focus under [section] 2511(a)(1) is not the degree of success a parent may have had in reaching the child, but examines whether, under the circumstances, the parent has utilized all

available resources to preserve the parent-child relationship." **C.M.**, 255 A.3d at 365.

> Even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months, the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights.

**Id.** at 364 (citation, brackets, and quotation marks omitted). Moreover, in examining the totality of the circumstances, courts must consider a parent's post-abandonment contact, including a parent's efforts to "recultivate a parent-child relationship." **In re K.Z.S.**, 946 A.3d 753, 759 (Pa. Super. 2008) (citation omitted). Courts may "consider the whole history of a given case and not mechanically apply the six-month statutory provision, although it is the six months immediately preceding the filing of the petition that is most critical to the analysis." **C.M.**, 255 A.3d at 364 (citation, brackets, and quotation marks omitted).

In considering a non-custodial parent's explanation, courts must determine "whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship." **L.A.K.**, 265 A.3d at 593. "What constitutes a 'barrier' in the context of a [s]ection 2511(a)(1) analysis is a finding within the discretion of the trial court, and what may constitute a barrier necessarily will vary with the circumstances of each case." **Id.** "[O]bstructive behavior by the child's custodian presents a barrier to the parent's ability to perform parental duties, which mitigates the parent's failure

to maintain the parent-child relationship." *Id.*; *see also C.M.*, 255 A.3d at 365 ("[O]bstructive behavior on the part of the custodial parent aimed at thwarting the other parent's maintenance of a parental relationship will not be tolerated, and certainly will not provide a sound basis for the involuntary termination of parental rights.") (citation omitted). "Fortitude is required, as a parent must act with 'reasonable firmness' to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities." *L.A.K.*, 265 A.3d at 592.

With these tenets in mind, we turn to the orphans' court's findings of fact. In its decree, the orphans' court specifically found that Father did not see Child from January 2, 2023, through mid-November 2023, and after November 2023, only visited with Child a handful of times. Final Decree, 8/30/2024, ¶¶ 12-13. It further found that during this period, Father did not make any phone calls to Child, request to see him, send him cards, or inquire about Child through email or text messages. *Id.*, ¶¶ 15-17. It found that because Mother did not inform Father about any school or doctors' appointments, he did not attend them. *Id.*, ¶ 14. The orphans' court found that no bond existed between Child and Father, Child felt uncomfortable with Father during visits, Father did not pay attention to Child during visits, and Child played with other children who were there. *Id.*, ¶¶ 18-19, 26, 29. It also found that Father was unemployed, without a driver's license, and never

paid child support, although it acknowledged Father once bought Child clothing. *Id.*, ¶ 20-21. The orphans' court noted Father's intellectual disability and mental health conditions, Mother's frustration with Father's lack of involvement in Child's life, her admission that she was not following the custody order, and that Child called Stepfather "dad." *Id.*, ¶ 21-22, 29. Relying on *C.M.* and *L.A.K.*, the orphans' court concluded that Mother and Stepfather met their burden under sections 2511(a)(1) and (b) and granted their petition to terminate Father's rights. *Id.*, ¶¶ 24-25, 27-28, 30.

In its opinion, the orphans' court relied on its August 30, 2024 decree and provided the following additional explanation for granting the petition to terminate Father's parental rights:

> [E]vidence presented [at the hearing] established no contact between Father and Child from January 2, 2023, through mid-November 2023. Beginning sometime in November 2023[,] Father had sporadic visits with Child. Testimony established that during these infrequent visits between Father and Child, Child spent his time playing with other children in Father's home and had no interactions with Father. Father paid no attention to Child during these visits and instead fell asleep, watched television, or used his phone. As such[,] it cannot be said that Father performed any parental duties during these visits[,] appearing more to fulfill the role of a babysitter. Further, Father testified that he and Child do not have a bond and that Child will cry and run away from Father. Finally, [legal and best interests counsel for Child] opined that it was in Child's best interest to have Father's parental rights terminated.

Orphans' Court Opinion, 10/8/2024, at 2-3 (party names supplied; citations to the record omitted). The orphans' court further found that Father was represented by private counsel when he filed a complaint for custody in 2018

- 15 -

and presented no evidence "that he was unable to obtain either private counsel or assistance either through a legal aid or a pro bono program to assist him to enforce the custody and visitation order in the period from 2018-2023." *Id.* at 4.

Our review of the record supports the orphans' court's findings. Although Father testified that he contacted Mother during the look-back period, the orphans' court credited Mother's testimony when it found that Father did not see Child from January 2, 2023, through mid-November 2023 and that Father did not have any contact whatsoever with Mother or Child during this period. Orphans' Court Opinion, 10/8/2024, at 3; Final Decree, 8/30/2024, ¶¶ 12, 15-16; N.T., 8/6/2024, at 8, 15-17. Despite having shared legal custody, Father did not support Child in any capacity in his educational process or medical care. *See* Final Decree, 8/30/2024, ¶ 14; *see also* N.T., 8/6/2024, at 17, 22, 31, 34. Indeed, he did not even know where Child attended school and was not involved in Child's schooling by attending meetings or helping him with letters, numbers, spelling his name, or homework during visits. N.T., 8/6/2024, at 22-23. Nor did Father attend any of Child's doctors' appointments, even when Mother informed him when they were occurring. *Id.* at 11. During the six months prior to filing the involuntary termination petition, Father did not provide any child support or financial assistance on behalf of Child and, throughout Child's life, contributed virtually nothing financially. Final Decree, 8/30/2024, ¶ 20; N.T., 8/6/2024, at 28, 61,

67. Father did not send Child cards or letters, and although Father said that he gave Child birthday cards and gifts in person, Child's birthday did not fall within the six month look-back period. Final Decree, 8/30/2024, ¶ 17; N.T., 8/6/2024, at 7, 65. During the "handful" of visits Child did have, the orphans' court likened Father's role to that of a babysitter, finding that Father did not interact with Child but instead fell asleep, watched television, and used his phone while Child spent his time there playing with other children. Orphans' Court Opinion, 10/8/2024, at 3; Final Decree, 8/303/2024, ¶¶ 13, 18-19; N.T., 8/6/2024, at 9, 13, 19-20, 23, 25, 33, 38, 56, 61.

The record further demonstrates that Father's individual circumstances and explanations for failing to perform his parental duties, in light of the totality of the circumstances, were insufficient for the orphans' court to find that they overcame the evidence in support of terminating his parental rights. The orphans' court noted, and the record confirms, that Father faced obstacles in performing his parental duties, including his multiple medical diagnoses; financial insecurity; no drivers' license or vehicle; the limited nature of his partial physical custody order; and Mother's failure to inform Father of Child's appointments or activities. Final Decree, 8/30/2024, ¶¶ 14, 21, 23. Nonetheless, the orphans' court found that Father did not take any affirmative steps to enforce the custody order against Mother, despite Father's ability to file a custody complaint in 2018; nor is there any record evidence that Father availed himself of his shared legal custody rights to become involved in Child's

schooling or medical care. Orphans' Court Opinion, 10/8/2024, at 4; Final Decree, 8/30/2024, ¶ 23. Accordingly, based on the totality of the circumstances and the record before us, we conclude that the orphans' court acted within the bounds of its discretion when it granted the petition to involuntarily terminate Father's parental rights pursuant to section 2511(a)(1).

We next turn to Father's second issue: whether the orphans' court failed to consider Child's needs and welfare and the effect termination would have on him under section 2511(b). Father's Brief at 11. Father argues that he wants to "encourage relationships between son and father." *Id.* He points to Paternal Grandmother's testimony that Father and Child hug each other at the start and end of visits, they play together with Legos and cars, Father makes Child food during visits, and he changed Child's diapers when he was a baby. *Id.* Father assails the orphans' court's failure to make findings concerning the impact on Child of not seeing him again and argues that he "should be allowed increased and unsupervised contact with his son to improve their relationship." *Id.* at 12.

Section 2511(b) provides, in pertinent part:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b). This requires that courts consider the matter from Child's perspective, placing Child's "developmental, physical, and emotional needs and welfare above concerns for the parent." *In re K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (citations omitted).

Our Supreme Court has cautioned that "the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved." *T.S.M.*, 71 A.3d at 268-69 (citation omitted). The party seeking termination bears the burden of proving, by clear and convincing evidence, that termination of parental rights serves a child's needs and welfare. *K.T.*, 296 A.3d at 1114 (citation omitted).

The law is clear that "the determination of the child's needs and welfare requires consideration of the emotional bonds between the parent and child. The utmost attention should be paid to discerning the effect on the child of permanently severing the parental bond." *T.S.M.*, 71 A.3d at 267 (quotation marks and citation omitted). It is not enough that there exists a bond between parent and child to avoid termination; rather, the trial court must determine whether the parent and child share an emotional bond and assess whether the bond is "necessary and beneficial" to the child, such that "maintaining the bond serves the child's developmental, physical, and emotional needs and welfare," as well as the effect upon the child of severing that bond. *K.T.*, 296 A.3d at 1109. This assessment requires the orphans' court to determine whether severing the bond "is the kind of loss that would predictably cause

- 19 -

extreme emotional consequences or significant, irreparable harm" to the child. ***Id.*** at 1109-10 (quotation marks and citations omitted).

Our review of the record supports the orphans' courts conclusion that termination of Father's parental rights best meets Child's developmental, physical, and emotional needs and welfare. ***See*** Final Decree, 8/30/2024, ¶ 30. Father's arguments ignore the undisputed fact (including by his own admission) that Father and Child do not share a bond. Orphans' Court Opinion, 10/8/2024, at 3; Final Decree, 8/30/2024, ¶¶ 23, 29; N.T., 8/6/2024, at 19, 33, 61. The record demonstrates that Child felt uncomfortable with Father during visits; in fact, Father admitted that Child refused to sit, talk, or watch movies with him; runs away from him; cries around him; and does not know him. Orphans' Court Opinion, 10/8/2024, at 3; Final Decree, 8/30/2024, ¶ 29; N.T., 8/6/2024, at 9, 19, 23, 25, 33, 38, 47-48, 56, 61-62. During Father's period of absence, the record demonstrates that Child did not mention Father at all and had begun to tell Mother that he did not want to visit with him. N.T., 8/6/2024, at 32-33. Further, the record shows Child is bonded to Stepfather, calls him "dad," and that Mother and Stepfather are the ones who meet all Child's needs. ***Id.*** at 18, 23, 28-29, 40-42, 43-44, 51. Based on the record before us, we find no abuse of discretion in the orphans' court's determination that termination of Father's parental rights was in Child's best interest pursuant to section 2511(b).

Accordingly, we affirm the orphans' court's decree granting the petition to involuntarily terminate of Father's parental rights.

Decree affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 3/11/2025